**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

June 12, 2014

# In the Court of Appeals of Georgia

A14A0261. NISBET et al. v. DAVIS.

BARNES, Presiding Judge.

Johnny J. Davis, as the surviving spouse of Brenda Davis, sued Dr. Rachel Nisbet and Gwinnett Pulmonary Group, P. C. for wrongful death, contending that the defendants failed to properly diagnose and treat Mrs. Davis for a bowel perforation at the Gwinnett Medical Center. Moving for summary judgment, the defendants argued that the plaintiff's claim arose out of the provision of "emergency medical care in a hospital emergency department" under Georgia's emergency medical care statute, OCGA § 51-1-29.5. Consequently, the defendants argued that the plaintiff was required to meet the heightened evidentiary burden of that statute and show by clear and convincing evidence that Dr. Nisbet was grossly negligent in her care and

treatment of Mrs. Davis. According to the defendants, the plaintiff failed to make such a showing.

The trial court denied summary judgment to the defendants, finding that OCGA § 51-1-29.5 did not apply because Mrs. Davis was not "in a hospital emergency department" when she was under the care of Dr. Nisbet. However, the trial court granted a certificate of immediate review to the defendants, and we granted their application for interlocutory appeal. This appeal followed in which we must determine whether the trial court erred in denying the defendants' motion for summary judgment under OCGA § 51-1-29.5.

For the reasons discussed below, we conclude that the trial court erred in determining that OCGA § 51-1-29.5 did not apply in this case. Nevertheless, we affirm the trial court's denial of summary judgment to the defendants because a question of fact exists as to whether the plaintiff demonstrated by clear and convincing evidence that Dr. Nisbet was grossly negligent.

Summary judgment is appropriate only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). On appeal from the denial of summary judgment, our review is de novo, and we construe the evidence

2

and all reasonable inferences drawn from it in the light most favorable to the nonmoving party. *Bank of North Ga. v. Windermere Dev.*, 316 Ga. App. 33, 34 (728 SE2d 714) (2012). "Moreover, we will affirm a trial court's denial of a motion for summary judgment if it is right for any reason." *Lowry v. Cochran*, 305 Ga. App. 240, 241 (699 SE2d 325) (2010).

Construed in favor of the plaintiff, the evidence showed that on the morning of September 10, 2009, Mrs. Davis, who was 64 years old, underwent laparoscopic surgery at DeKalb Medical Center to address an ovarian cyst and pelvic pain. The surgical procedure was performed under general anesthesia and included the removal of Mrs. Davis's right ovary and fallopian tube, as well as the lysis of adhesions found on her abdominal wall. During the course of the laparoscopic procedure, the surgeon inadvertently perforated Mrs. Davis's bowel twice. However, neither the surgeon nor the other medical personnel discovered the perforation, and Mrs. Davis was discharged from the hospital around noon.

In the early afternoon of September 11, 2009, Mrs. Davis felt unwell and became short of breath. Mrs. Davis and her husband attempted to return to DeKalb Medical Center, but they diverted to Gwinnett Medical Center, which was closer to their home, because Mrs. Davis felt like she could not breathe at all.

Mrs. Davis and her husband arrived at the Gwinnett Medical Center emergency department at around 4 p.m. Following her arrival at the emergency department, Mrs. Davis complained of difficulty breathing. She had very low blood pressure, to the point where a triage nurse was unable to read her blood pressure using two separate machines. According to an assessment sheet filled out by a different nurse, Mrs. Davis had labored breathing and was "moaning [with] every breath." In light of her symptoms and appearance, Mrs. Davis's acuity level was assessed by the triage nurse as "emergent." One of the plaintiff's medical experts later opined that when Mrs. Davis arrived at the emergency department, she was already suffering from septic shock from the bowel perforation and needed immediate surgery to save her life.

At 4:40 p.m., Dr. Keith Buchanan, an emergency department physician, examined Mrs. Davis. Mrs. Davis told Dr. Buchanan about her recent surgery and informed him that she was having difficulty breathing and that her abdomen felt "tight." After conducting a physical examination, Dr. Buchanan developed a differential diagnosis of pulmonary embolism, aspiration pneumonia, or intra-abdominal bleeding. He ordered a chest x-ray, abdominal ultrasound, and laboratory cultures.

At 5:49 p.m., Mrs. Davis began vomiting a green substance while waiting in the emergency department. Subsequently, at 7:45 p.m., an emergency department nurse noted on her assessment sheet that Mrs. Davis's abdomen was "firm and distended" and was "tender to touch." The nurse informed Dr. Buchanan, who paged Dr. Rachel Nisbet at 7:45 p.m. and asked her to come to the emergency department to evaluate Mrs. Davis because of her "critical status."

Dr. Nisbet is a physician with the Gwinnett Pulmonary Group and is board certified in internal medicine, pulmonology, and critical care. The Gwinnett Pulmonary Group manages patients in the Intensive Care Unit ("ICU") at Gwinnett Medical Center, although its physicians also serve as consultants in the emergency department and often evaluate critically ill patients there before they are admitted to the ICU. Dr. Nisbet was the on-call physician for the Gwinnett Pulmonary Group starting at 5:00 p.m. on Friday, September 11 until 7:00 a.m. on Saturday, September 12.

Dr. Nisbet first saw Mrs. Davis in the emergency department at 8:51 p.m., according to medical records produced by the hospital. Dr. Nisbet spoke with the nurses and Dr. Buchanan, evaluated the x-ray and ultrasound results, and spoke with Mrs. Davis and her husband about her medical history, including her recent surgery.

5

Mrs. Davis was able to communicate to Dr. Nisbet that she was unable to breathe, that she was scared, and that her post-operative abdominal pain was slightly worse than the previous day. Dr. Nisbet conducted a physical exam and noted in her progress notes that Mrs. Davis's abdomen was "[d]istended with tenderness in both the left and right lower quadrant her incision site." She also noted that Mrs. Davis had diminished breath sounds, a blood pressure of only "80/42," and tachycardia (an elevated heart rate). Mrs. Davis's blood work further indicated that she was in acute renal failure.

Following her examination of Mrs. Davis, Dr. Nisbet ordered that she be admitted into the ICU under her care at approximately 9:00 p.m. Based on her physical exam and review of the tests ordered by Dr. Buchanan, Dr. Nisbet concluded that Mrs. Davis was in septic shock caused by aspiration pneumonia in light of her recent surgery. She decided not to order an abdominal CT scan because she believed that Mrs. Davis's condition was too precarious to permit moving her to the radiology department to obtain the scan. Despite the temporal connection between Mrs. Davis's surgery and the onset of her symptoms and the inability to obtain a CT scan, Dr. Nisbet chose not to order a surgical consult to rule out whether Mrs. Davis had a bowel perforation or other complication causing her sepsis that would require emergency surgery to correct.

6

Although Mrs. Davis was unstable and her life-threatening condition was deteriorating, Dr. Nisbet went home after her initial examination of Mrs. Davis. Mrs. Davis was the only patient that Dr. Nisbet had to treat during the rest of her on-call shift.

Mrs. Davis remained in the emergency department for the next several hours, despite the order entered by Dr. Nisbet to have her admitted to the ICU. While Dr. Nisbet believed that Mrs. Davis needed to be transferred immediately to the ICU, she did not follow up with the ICU to facilitate the transfer and was unaware of the delay.

Around midnight, when Mrs. Davis was still in the emergency department, another physician called Dr. Nisbet and informed her that he had been unsuccessful at placing a central line in Mrs. Davis and was still having to rely on two peripheral IV lines already in place. Although Dr. Nisbet could have placed the central line herself, she decided "that it was okay for now and that [she] would consult vascular surgery for placement of a central line." However, Dr. Nisbet remained at home and chose not to consult vascular surgery at that time.

At 12:26 a.m., Dr. Nisbet was notified by an emergency department nurse that Mrs. Davis's heart rate was in the 150s and that she had decreased urinary output. Dr. Nisbet changed her medications over the phone but did not return to the hospital.

7

Shortly after 1:00 a.m., Mrs. Davis was transported to the ICU. On the way to the ICU, one of Mrs. Davis's peripheral IV lines came out. Mrs. Davis's remaining peripheral IV line infiltrated a few hours later. Dr. Nisbet was informed and ordered another medication over the phone to counteract the infiltration.

Dr. Nisbet returned to the hospital at 4:00 a.m. to place the central line herself and reevaluate Mrs. Davis. Upon conducting an abdominal exam on Mrs. Davis, Dr. Nisbet became concerned that Mrs. Davis was suffering from an "acute" or "surgical" abdomen, meaning an acute intra-abdominal condition that can be caused by, among other things, bleeding or perforation, and that usually requires surgical intervention. Around 6:00 a.m., Dr. Nisbet wrote orders for a surgical consult to evaluate Mrs. Davis's abdomen.

Around 6:30 a.m., Dr. William McGann, another physician with the Gwinnett Pulmonary Group, arrived at Gwinnett Medical Center to take over as the on-call physician for Dr. Nisbet. After examining Mrs. Davis, Dr. McGann wrote in his progress note that she was unresponsive, that her abdomen was distended and firm, and that there was "obvious peritoneal sign." Dr. McGann concluded that Mrs. Davis needed emergency laparoscopic surgery and contacted the surgeon for the consultation.

Dr. Nisbet left the hospital a little after 6:30 a.m. The surgeon arrived and examined Mrs. Davis. He noted that she was in "obvious acute abdomen septic shock." A progress note from the ICU at 7:00 a.m. states that Mrs. Davis's abdomen was large, rigid, and distended, that greenish pus was seeping from her umbilicus area, and that she had no detectible blood pressure. The surgeon immediately took Mrs. Davis back for emergency laparoscopic surgery.

During the surgery, the surgeon discovered that Mrs. Davis had a perforated bowel and gangrene of the abdominal wall. Mrs. Davis' condition continued to deteriorate after the surgery, and she died at 10:42 p.m.

The plaintiff, Mrs. Davis's late husband, commenced this wrongful death action against Dr. Nisbet and the Gwinnett Pulmonary Group.[1] In the complaint, the plaintiff alleged that Mrs. Davis died as a result of Dr. Nisbet's failure to obtain a surgical consult after initially evaluating Mrs. Davis in the emergency department on September 11, 2009. According to the plaintiff and his medical expert, given the inability to obtain an abdominal CT scan, Dr. Nisbet should not have ruled out

---

[1] Mr. Davis also sued the obstetrician/gynecologist who performed the original laparoscopic surgery on Mrs. Davis and his physician group. Mr. Davis's claims against the obstetrician/gynecologist and his physician group are not before us in this appeal.

abdominal surgical complications as a basis for Mrs. Davis's septic shock without first obtaining the consultation of a surgeon, who would have been more experienced with the signs and symptoms associated with a surgical abdomen. The plaintiff further alleged that if a surgery consult had been obtained on September 11 shortly after Dr. Nisbet examined Mrs. Davis, her perforated bowel would have been discovered in time to save her life.

Following discovery, the defendants moved for summary judgment. They contended that the uncontroverted evidence showed that the case was governed by Georgia's emergency medical care statute, OCGA § 51-1-29.5, because the plaintiff's cause of action against Dr. Nisbet arose "out of the provision of emergency medical care in a hospital emergency department." OCGA § 51-1-29.5 (c). Consequently, the defendants argued that the higher evidentiary burden imposed by that statute applied, requiring the plaintiff to prove by clear and convincing evidence that Dr. Nisbet committed gross negligence in her care and treatment of Mrs. Davis. According to the defendants, the plaintiff did not show by clear and convincing evidence that Dr. Nisbet was grossly negligent, which necessitated the grant of summary judgment in their favor.

10

The trial court denied the defendants' motion for summary judgment, concluding that OCGA § 51-1-29.5 did not apply to Dr. Nisbet's care of Mrs. Davis. Construing OCGA § 51-1-29.5 (c), the trial court concluded that application of the statute was dependent on the department of the physician responsible for the patient's care, not the physical location of the patient in the hospital. The trial court found that Dr. Nisbet was a physician in the critical care department of the hospital, not the emergency department, and that Mrs. Davis thus became a patient of the critical care department when Dr. Nisbet took over her care and wrote orders to transfer her to the ICU. As such, the trial court found that Dr. Nisbet's treatment of Mrs. Davis was not "in a hospital emergency department" for purposes of OCGA § 51-1-29.5 (c), even though Mrs. Davis continued to be "temporarily housed" there for several hours after she was transferred to Dr. Nisbet's care. The trial court thus concluded that the higher evidentiary burden imposed by OCGA § 51-1-29.5 did not apply. The trial court then went on to find that there were genuine issues of material fact regarding whether Dr. Nisbet had committed ordinary negligence in her evaluation and treatment of Ms. Davis on September 11, precluding the grant of summary judgment to the defendants.

1. The defendants contend that the trial court erred in concluding that OCGA § 51-1-29.5 (c) does not apply in this case. We agree.

11

Georgia's emergency medical care statute, OCGA § 51-1-29.5, provides in relevant part:

> In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c). Based on this statutory language, there are three conditions which must be present for the emergency medical care statute to apply: (a) the lawsuit must involve a "health care liability claim"; (b) the claim must arise out of the provision of "emergency medical care"; and the (c) care must have been provided to the patient "in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department." Id.

(a) *"Health Liability Claim."* The plaintiff does not dispute that his lawsuit involves a "health liability claim." See OCGA § 51-1-29.5 (a) (9) ("'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of

12

medical care, health care, or safety or professional or administrative services directly related to health care, which departure from standards proximately results in injury to or death of a claimant.").

(b) *"Emergency Medical Care."* The uncontroverted evidence also shows that the plaintiff's claim against Dr. Nisbet arose out of the provision of "emergency medical care." That term is defined by the emergency medical care statute as:

> bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5).

Here, the evidence showed that Mrs. Davis arrived in the emergency department suffering from septic shock and that her blood work showed acute renal failure. Mrs. Davis was triaged as an "emergent" patient, and Dr. Buchanan requested that Dr. Nisbet evaluate her in the emergency department due to her "critical status."

13

Indeed, the plaintiff's expert physician opined that when Mrs. Davis arrived at the emergency department, she was in septic shock from the bowel perforation and needed immediate surgery to save her life. Nor is there any evidence that Mrs. Davis's medical condition ever stabilized so as to render her capable of receiving medical treatment as a nonemergency patient; rather, the undisputed evidence shows that her medical condition continued to deteriorate throughout her stay in the emergency department.

Under these circumstances, the evidence showed without dispute that Mrs. Davis had an emergency medical condition at the time that Dr. Nisbet diagnosed and treated her on September 11. Hence, the diagnosis and treatment provided to Mrs. Davis by Dr. Nisbet, although alleged to be deficient, constituted "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5). See *Abdel-Samed v. Dailey*, 294 Ga. 758, 761-762 (1) (755 SE2d 805) (2014) (defendants' care and treatment of patient who needed emergency surgery, where plaintiff alleged that defendants failed to properly transfer patient to a surgeon, constituted "emergency medical care"); *Quinney v. Phoebe Putney Memorial Hosp.*, 325 Ga. App. 112, 115-117 (1) (751 SE2d 874) (2013) (defendants' care of patient whose health was in serious jeopardy, where plaintiff alleged that defendants failed to properly diagnose and treat the

14

patient's condition, constituted "emergency medical care"). Compare *Howland v. Wadsworth*, 324 Ga. App. 175, 180-181 (2) (749 SE2d 762) (2013) (evidence was in conflict as to whether patient "was relatively stable at all times and [whether] her condition had improved while she was in the emergency room" when defendants treated her, such that a jury had to decide whether the care received by patient was "emergency medical care").

(c) *"Hospital Emergency Department."* Given that the first two prongs of the test are satisfied, the applicability of the emergency medical care statute in this case turns on whether the care provided to Mrs. Davis by Dr. Nisbet on September 11 was "in a hospital emergency department" under OCGA § 51-1-29.5 (c).[2] It is undisputed that Mrs. Davis was physically located in the ER when Dr. Nisbet treated her on September 11. Nevertheless, the trial court found the statutory phrase "in a hospital emergency department" to be "ambiguous as to whether the patient's location within the hospital supercedes the physician's department." The trial court further found that the undisputed evidence showed that although Mrs. Davis was physically in the

---

[2] We note that the plaintiff in his complaint alleged medical malpractice by Dr. Nisbet based only on her care and treatment of Mrs. Davis while she was physically in the emergency department on September 11, before she was transported to the ICU in the early morning hours of September 12.

15

emergency department when Dr. Nisbet initially examined her, Dr. Nisbet was a physician in the critical care department and wrote orders after examining Mrs. Davis to admit her to the ICU under her care. For this reason, the trial court found that Dr. Nisbet's was not acting "under the umbrella" of the emergency department and that her care of Mrs. Davis was not "in a hospital emergency department" for purposes of OCGA § 51-1-29.5 (c).

The trial court's interpretation and application of the emergency medical care statute was erroneous. "On appeal, we review the lower court's interpretation of a statute de novo, as statutory interpretation is a question of law." *Hill v. First Atlanta Bank*, 323 Ga. App. 731, 732 (747 SE2d 892) (2013). "In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly," and "[t]he legislative intent is determined from a consideration of the entire statute." (Citations and punctuation omitted.) *Bonds v. Nesbitt*, 322 Ga. App. 852, 854-855 (1) (747 SE2d 40) (2013). See OCGA § 1-3-1 (a). "When the language of a statute is plain and unambiguous and not leading to an absurd result, it evidences the legislative intent which is not to be contravened." *Dept. of Transp. v. Evans*, 269 Ga. 400, 401 (499 SE2d 321) (1998).

16

Here, the emergency medical care statute applies to claims arising out of the provision of emergency medical care "*in* a hospital emergency department." (Emphasis supplied.) OCGA 51-1-29.5 (c). "In the absence of words of limitation, words in a statute should be given their ordinary and everyday meaning." (Citations and punctuation omitted.) *Six Flags Over Ga. II, LP v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003). By its ordinary and everyday meaning, care provided "in a hospital emergency department" is care provided to a patient in a particular location in a hospital. And, in common parlance, the terms "emergency department" and "emergency room" are used interchangeably to refer to that part of the hospital to which a patient rushes in an emergency. Thus, contrary to the trial court's conclusion, the phrase "in a hospital emergency department" refers to the physical location within the hospital where the patient arrives for emergency medical care, commonly referred to as the "emergency room."

The General Assembly's use of the phrase "in a hospital emergency department" to mean the physical location in which a patient is treated is further reflected by its inclusion in the statute of two other locations within which a patient may be treated for an emergency. Specifically, the emergency medical care statute applies to care "in a hospital emergency department or obstetrical unit or in a surgical

17

suite immediately following the evaluation or treatment of a patient in a hospital emergency department." OCGA § 51-1-29.5 (c). A phrase found in a statute "must be gauged by the words surrounding it." *Anderson v. Southeastern Fidelity Ins. Co.*, 251 Ga. 556 (307 SE2d 499) (1983) ("Words, like people, are judged by the company they keep."). The reference to two other physical locations within the hospital in the same sentence of the statute further buttresses our conclusion that the phrase "in a hospital emergency department" refers to a physical location within the hospital.

In reaching a different result, the trial court emphasized that Dr. Nisbet was a physician in the critical care department rather than the emergency department of the hospital. But the emergency medical care statute makes no distinction among the specialties of the physicians to whom it applies. Rather, the statute broadly defines "physician" as "an individual licensed to practice medicine in this state, a professional association organized by an individual physician or group of physicians, or a partnership or limited liability partnership formed by a group of physicians." OCGA § 51-1-29.5 (a) (17). If the General Assembly had intended to distinguish between physicians within different departments, it could have easily done so by narrowly defining the medical providers to whom the statute applies. Instead, the

emergency medical care statute was drafted to cover any physician providing emergency medical care to a patient located in the emergency room.

In the present case, the uncontroverted evidence shows that Dr. Nisbet was providing care and treatment to Mrs. Davis while she was physically located in the hospital emergency department on September 11. Accordingly, the emergency medical care statute applies as a matter of law. It follows that the heightened evidentiary burden of OCGA § 51-1-29.5 (c) applies to the plaintiff's claim against Dr. Nisbet, and the trial court erred in concluding otherwise.[3]

2. Even though the trial court erred in concluding that Georgia's emergency medical care statute had no application in this case, we will affirm the trial court if right for any reason. *Lowry*, 305 Ga. App. at 241. Thus, we must determine whether there exists a question of fact under the heightened evidentiary burden imposed upon the plaintiff by OCGA § 51-1-29.5 (c).

Under the heightened burden imposed by OCGA § 51-1-29.5 (c), the plaintiff would have the burden at trial of proving by clear and convincing evidence that Dr.

---

[3] In light of our decision in Division 1 (c) regarding the plain meaning of the phrase "in a hospital emergency department," we need not consider the defendants' claim that the trial court erred in considering testimony from the plaintiff's expert regarding the meaning of that phrase.

19

Nisbet was grossly negligent in her evaluation and treatment of Mrs. Davis in the emergency department on September 11. "Gross negligence" is defined as

> the absence of even slight diligence, and slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence is equivalent to the failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise.

(Citation and punctuation omitted.) *Quinney*, 325 Ga. App. at 117 (2). See *Gliemmo v. Cousineau*, 287 Ga. 7, 12-13 (4) (694 SE2d 75) (2010). When this definition is applied in the context of the emergency medical statute,

> liability would be authorized where the evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the defendants caused harm by grossly deviating from the applicable medical standard of care. [And], [a]s a general rule, when facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury.

(Citations and punctuation omitted.) *Abdel-Samed*, 294 Ga. at 766 (3).

20

Construed in favor of the plaintiffs, the evidence showed that when Dr. Nisbet evaluated Mrs. Davis in the emergency room around 8:51 p.m., Mrs. Davis was in septic shock with acute renal failure after having had laparoscopic surgery where the surgeon entered through her abdomen cavity the previous day. Her blood pressure was low, her heart rate was elevated, and she was having extreme difficulty breathing. Mrs. Davis had vomited after arriving at the emergency department, and a nurse's recent assessment note stated that Mrs. Davis's abdomen was "firm and distended" and was "tender to touch." Dr. Nisbet herself noted that Mrs. Davis's abdomen was "[d]istended with tenderness in both the left and right lower quadrant [of] her incision site." Nevertheless, despite the short lapse of time between Mrs. Davis's laparoscopic surgery and her septic shock and the inability to obtain an abdominal CT scan, Dr. Nisbet concluded that the cause of the sepsis was aspiration pneumonia, chose not to consult a surgeon with expertise in recognizing the condition of surgical abdomen to rule out the possibility of a bowel perforation or other surgical complication, and went home. Dr. Nisbet then waited approximately seven hours before conducting another abdominal exam, despite receiving phone calls from the emergency department during the course of the night reflecting the deteriorating condition and critical status of Mrs. Davis.

The plaintiff presented expert testimony that Dr. Nisbet's failure to obtain a surgical consult or to reexamine Mrs. Davis's abdomen in a timely manner violated the applicable standard of care. According to the plaintiff's expert, Dr. Nisbet did not take appropriate steps to rule out the possibility of a bowel perforation or other surgical complication, even though the "first thought[]" of a competent doctor "would be something obviously happened at the time of the surgery" if the patient arrives at the hospital shortly after the surgery with a "catastrophic illness." The plaintiff's expert further testified that this case was a "no-brainer" in light of Mrs. Davis symptoms in close temporal connection with her surgery, and that the diagnosis in this context should have been "surgical abdomen until proven otherwise." Additionally, the plaintiff's expert testified that Dr. Nesbit's conclusive diagnosis of aspiration pneumonia "made no sense," particularly because septic shock caused by aspiration pneumonia is "fairly rare." The plaintiff's expert also testified that to exclude the possibility of an abdominal surgical complication, Dr. Nisbet should have ordered a surgical consult after first examining Mrs. Davis, given that a CT scan of her abdomen could not be obtained in light of her unstable condition, and should have reexamined Mrs. Davis' abdomen several times over the course of the night to detect

any changes. In the opinion of the plaintiff's expert, Dr. Nisbet's decision instead to go home in light of the critical status of Mrs. Davis was simply "unconscionable."

Furthermore, one of the defense experts conceded that ordering a surgical consult would have simply been a matter of making a phone call. Another defense expert conceded that it is "not hard at all" to obtain a surgical consult and that would have been very easy for Dr. Nisbet to have gotten one in this case. And, there was evidence from which a jury could infer that if Dr. Nisbet had timely obtained a surgery consult, emergency surgery would have been performed much earlier on Mrs. Davis, as evidence by the fact that when a surgeon finally saw Mrs. Davis, he immediately recognized that she was suffering from "obvious acute abdomen septic shock."

The defendants, however, argue that a jury could not find gross negligence because Dr. Nisbet exercised at least slight diligence in caring for Mrs. Davis. The defendants note that Dr. Nisbet evaluated a chest x-ray, ultrasound, and lab work before coming to her diagnosis of aspiration pneumonia, and they assert that Dr. Nisbet performed a thorough abdominal examination of Mrs. Davis, which did not reveal two of the "classic" signs of a surgical abdomen, rebound tenderness and

guarding.[4] As such, the defendants contend that Dr. Nisbet's diagnosis of aspiration pneumonia and treatment based on that diagnosis did not constitute a gross deviation from the applicable standard of care.

But the defendants' assertions in this regard did not go unrebutted. The plaintiff's expert testified that the tests relied upon by Dr. Nisbet were not the proper diagnostic measures for ruling out an abdominal surgical complication, which required a CT scan or surgical consult. The plaintiff's expert, in fact, opined that the type of ultrasound performed on Mrs. Davis and relied upon by Dr. Nisbet was simply a "worthless test" in this specific context, and that the chest x-ray, which was performed on Mrs. Davis while she was in a supine rather than upright position, was not the "right exam" for Dr. Nisbet to rely on to rule out an abdominal surgical complication.

As to the issue of rebound tenderness and guarding, the plaintiff's expert testified that these two signs are not always present in patients in the emergency room context because of the medications being administered to them that affect their mental

---

[4] A patient has "rebound tenderness" if she reacts in pain when the physician lets go after pushing in on her belly. A patient exhibits "guarding" behavior if she attempts to push away the physician's hand or move out of the way when the physician tries to examine her abdomen.

status. Moreover, the plaintiff presented evidence calling into question the thoroughness of Dr. Nisbet's abdominal examination of Mrs. Davis on September 11. In this regard, the plaintiff's expert testified that the nursing notes from the emergency department reflected that Mrs. Davis had signs of a surgical abdomen that were missed by Dr. Nisbet. Indeed, a nurse's assessment note written before Dr. Nisbet's examination stated that Mrs. Davis's abdomen was "firm and distended" and was "tender to touch." Thus, in light of the medical records and the plaintiff's expert testimony, a jury could choose not to credit Dr. Nisbet's testimony about the thoroughness of her abdominal exam of Mrs. Davis and instead conclude that she missed signs of a surgical abdomen that were present.

For these combined reasons, we cannot say as a matter of law that a reasonable jury would be unable to find by clear and convincing evidence that Dr. Nisbet grossly deviated from the standard of care in her care and treatment of Mrs. Davis. See *Abdel-Samed*, 294 Ga. at 765-766 (3); *Johnson v. Omondi*, 294 Ga. 74, 76-79 (751 SE2d 288) (2013); *Quinney*, 325 Ga. App. at 117-120 (2).[5] Accordingly, although the

---

[5] This case is distinguishable from *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008), where summary judgment was properly granted to the physician. In *Pottinger*, the uncontroverted evidence showed that the physician ordered the proper diagnostic test appropriate to the symptoms of the patient and then relied upon the services of another professional to evaluate the results of the test when

emergency medical care statute applies as a matter of law to the plaintiff's claim, the plaintiff has shown facts sufficient to raise a jury question regarding whether Dr. Nisbet committed gross negligence. The trial court therefore committed no error in denying summary judgment to the defendants.

*Judgment affirmed. Boggs and Branch, JJ., concur.*

---

determining the course of treatment. Under those specific circumstances, a reasonable jury could not find that the physician grossly deviated from the standard of care. See *Johnson*, 294 Ga. at 79 (discussing *Pottinger*); *Quinney*, 325 Ga. App. at 120 (2) (same). In contrast, the plaintiff presented evidence in this case that Dr. Nisbet failed to order the proper diagnostic measure (a surgical consult) appropriate to the circumstances and symptoms of Mrs. Davis.