**FIFTH DIVISION**
**REESE, P. J.,**
**MARKLE and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 23, 2020**

# In the Court of Appeals of Georgia

A20A1447. OB-GYN ASSOCIATES, P. A. et al v. BROWN et al.

COLVIN, Judge.

Kimberly and Onswa Brown, individually and as next friends of K. B., a minor, ("Plaintiffs") filed the instant medical malpractice lawsuit against Ob-Gyn Associates, P. A. and Peggy Register, CNM ("Defendants") for injuries that the newborn sustained during childbirth in the obstetrical unit at Wellstar Kennestone Hospital. Defendants appeal from the trial court's denial of their partial motion for summary judgment regarding the applicable standard of care. This court granted Defendants' application for interlocutory appeal. On appeal, Defendants argue that the heightened gross negligence standard set forth in OCGA § 51-1-29.5 (c) applies to all emergency medical care provided in an obstetrical unit. Defendants also argue that the trial court erroneously concluded that an issue of material fact precluded summary judgment on

the issue of whether the shoulder dystocia at issue constituted a medical emergency as defined by OCGA § 51-1-29.5 (a) (5). For the following reasons, we reverse.[1]

This Court reviews

the grant or denial of summary judgment . . . de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. Summary judgment is warranted only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Once the movant has made a prima facie showing that it is entitled to judgment as a matter of law, the burden shifts to the respondent to come forward with rebuttal evidence.

(Citations omitted.) *Abdel-Samed v. Dailey*, 294 Ga. 758, 760 (1) (755 SE2d 805) (2014).

So viewed, the record shows that on March 12, 2012, Kimberly Brown presented at Wellstar Kennestone Hospital for labor and delivery. Brown labored at the hospital until nurses notified Peggy Register, the certified nurse midwife, that Brown would deliver soon at 11:04 a.m. and paged her 11:41 a.m. The medical record prepared by Register shows that at 11:51 a.m., a spontaneous vaginal delivery

---

[1] The Court thanks the Georgia Trial Lawyers Association and the Medical Association of Georgia for their amicus curiae briefs.

occurred. The delivery note stated that the head was delivered, there was no nuchal cord, and a shoulder dystocia occurred that was resolved within 40 seconds.[2]

The delivery summary notes state that during the 40-second shoulder dystocia, Register performed standard shoulder dystocia alleviation maneuvers, including the McRoberts maneuver, suprapubic pressure, a rotational maneuver of the anterior shoulder, and delivery of the posterior arm. She also utilized lateral traction in the delivery. As a result of the traction used during the delivery, the newborn had a broken clavicle, caput succedaneum, bruising on the forehead and face, and a permanent injury to her right brachial plexus.

Plaintiffs sued Defendants for the newborn's injuries arising from the midwife's handling of the shoulder dystocia. Plaintiff's complaint alleges that the newborn's injury was due to Register's application of excessive traction during the forty seconds after the shoulder dystocia was encountered.

Defendants filed for partial summary judgment regarding the applicable standard of care, arguing that the heightened gross negligence standard set forth in OCGA § 51-1-29.5 applies in this case. The trial court denied the motion, finding that

---

[2] Plaintiffs define a shoulder dystocia as a delivery where, "after delivery of the fetal head, additional obstetric maneuvers beyond gentle traction are needed to enable delivery of the fetal shoulders" because they are stuck on the mother's pelvic bones.

the gross negligence standard did not apply because Brown never presented to the hospital's emergency department. The trial court's order further held that an issue of material fact existed as to whether the shoulder dystocia constituted a medical emergency because Register was able to resolve the shoulder dystocia within forty seconds.

1. Defendants argue that the trial court erred by denying their motion for partial summary judgment regarding the applicable standard of care. For the following reasons, we reverse.

When construing statutory language, our analysis must begin

with familiar and binding canons of construction. First and foremost, in considering the meaning of a statute, our charge as an appellate court is to presume that the legislature meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. In summary, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.

(Punctuation and footnotes omitted.) *Southwestern Emergency Physicians, P. C. v. Quinney*, 347 Ga. App. 410, 420-421 (3) (819 SE2d 696) (2018). With these guidelines in mind, we turn to the statutory language at issue.

In 2005, the Georgia General Assembly passed an emergency medical care law reducing the standard of care in cases involving the provision of certain categories of "emergency medical care" from negligence to gross negligence. OCGA § 51-1-29.5. The relevant portion of that statute provides:

> In an action involving a health care liability claim arising out of the provision of emergency medical care in *a hospital emergency department* or *obstetrical unit* or *in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department*, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c).[3] If the gross negligence standard of care described in OCGA

§ 51-1-29.5 (c) applies to the instant case, then the Plaintiffs "would bear the burden

at trial of proving by clear and convincing evidence that the [D]efendants were

grossly negligent" in their treatment of the shoulder dystocia. See *Abdel-Samed*, 294

Ga. at 765 (3).[4]

---

[3] Under OCGA § 51-1-29.5,
there are three conditions which must be present for the emergency medical care statute to apply: (a) the lawsuit must involve a "health care liability claim"; (b) the claim must arise out of the provision of "emergency medical care"; and (c) the care must have been provided to the patient "in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department."

(Citation and punctuation omitted.) *Nisbet v. Davis*, 327 Ga. App. 559, 564-565 (1) (760 SE2d 179) (2014).

[4] 'Gross negligence' is defined as the absence of even slight diligence, and slight diligence is defined in OCGA § 51-1-4 as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. See OCGA § 51-1-4. Applying this definition in the context of a medical malpractice action brought pursuant to OCGA § 51-1-29.5 (c), liability would be authorized where the evidence, including admissible

6

Defendants argue that the gross negligence standard set forth in OCGA § 51-1-29.5 applies to Plaintiff's claims because the alleged malpractice occurred while Brown was a patient who received emergency medical care in an obstetrical unit at the hospital. Defendants argue that the limiting phrase "immediately following the evaluation or treatment of a patient in a hospital emergency department" in OCGA § 51-1-29.5 (c) applies *only* to emergency care provided "in a surgical suite." Plaintiffs, on the other hand, argue that the limiting phrase applies to obstetrical units as well, so that the statute should be read to mean that the gross negligence standard applies only to the "provision of emergency medical care . . . in an obstetrical unit . . . immediately following the evaluation or treatment of a patient in a hospital emergency department[,]" and not to all emergency medical care rendered in an obstetrical unit.

expert testimony, would permit a jury to find by clear and convincing evidence that the defendants caused harm by grossly deviating from the applicable medical standard of care.

(Citation and punctuation omitted.) Id.

7

Applying the plain and ordinary meaning of the statute and rules of grammar, as we must, we note that OCGA § 51-1-29.5 (c) constitutes a list of three locations followed by a limiting clause. In OCGA § 51-1-29.5 (c), the legislature specified three locations within a hospital where a provider of emergency medical care would be subject to the gross negligence standard. The list is twice set apart by the preposition "in." The first use of the preposition "in" creates one category of two locations that are *not* modified by the limiting phrase – that is: "the hospital emergency department" and "the obstetrical unit." The second use of the preposition "in" creates a second location category that *is* modified by the limiting phrase: "in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department," which distinguishes this third location from the two identified earlier in the sentence. See OCGA § 51-1-29.5 (c) ("In an action involving a health care liability claim arising out of the provision of emergency medical care [(1) (a)] *in* a hospital emergency department or [(b)] obstetrical unit or [(2)] *in* a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department . . .") (emphasis supplied). The limiting phrase "immediately following the evaluation or treatment of a patient in a hospital emergency department" acts as a spatial and temporal modifier that clearly applies

8

only to care rendered in a surgical suite in an effort to distinguish from routine and planned care provided in a surgical suite. See, e. g., *Keaton v. State*, 311 Ga. App. 14, 28 (1) (714 SE2d 693) (2011) (Blackwell, J. concurring in part and dissenting in part) ("According to the rule of the last antecedent, which is an accepted convention of English grammar, a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows") (punctuation omitted) (citing *Barnhart v. Thomas*, 540 U. S. 20, 26 (II) (124 S.Ct. 376, 157 LE2d 333) (2003)). Accord *Deal v. Coleman*, 294 Ga. 170, 173-174 (1) (a) (751 SE2d 337) (2013).

Although "[i]t is true that the rule of the last antecedent is not an absolute and can assuredly be overcome by other indicia of meaning," *Keaton*, 311 Ga. App. at 28, there is no contrary indicia of meaning in OCGA § 51-1-29.5 (c) that suggests the limiting phrase should be construed to either of the other two locations identified in the statute: the "hospital emergency department" and the "obstetrical unit."[5] Instead, applying the limiting phrase to all locations in the series would result in the absurd requirement that a heightened standard only apply in "a hospital emergency

---

[5] See *Nisbet*, 327 Ga. App. at 567 (1) (b) (In interpreting OCGA § 51-1-29.5 (c), this Court held that "[b]y its ordinary and everyday meaning, care provided 'in a hospital emergency department' is care provided to a patient in a particular location in a hospital.")

9

department [ . . . ] immediately following the evaluation or treatment of a patient in a hospital emergency department." OCGA § 51-1-29.5 (c). Such a construction would render some language mere surplusage. See *Blue Moon Cycle, Inc. v. Jenkins*, 281 Ga. 863, 864 (642 SE2d 637) (2007) ("The fundamental rules of statutory construction require us to construe a statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage") (citation and punctuation omitted).

Because the injury took place in an obstetrical unit to which the gross negligence standard applies as a matter of law, we conclude that the trial court's denial of Defendants' motion for partial summary judgment was in error. OCGA § 51-1-29.5 (c) applies to the provision of medical care in an obstetrical unit.

2. Defendants next argue that the trial court erred by ruling that a fact question precluded summary judgment on the issue of whether the resolution of a shoulder dystocia constitutes "emergency medical care," such that OCGA § 51-1-29.5 (c) would apply in this case. We agree.

As noted above, the gross negligent standard in OCGA § 51-1-29.5 (c) applies only to claims "arising out of the provision of emergency medical care." OCGA § 51-1-29.5 (c). OCGA § 51-1-29.5 (a) (5) defines "Emergency medical care" as follows:

10

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by *acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part*. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

(Emphasis supplied).

This Court has further explained that

whether the condition of the patient meets the definition of "emergency medical care" is an objective, rather than subjective, test. The patient's actual medical or traumatic condition is determinative – but only as that condition is revealed by the patient's symptoms. The factfinder must consider the evidence regarding the symptoms the patient presented and determine whether those symptoms were acute and sufficiently severe to show that the patient had a medical or traumatic condition that could reasonably be expected to seriously impair her health if not attended to immediately.

(Citation omitted; emphasis supplied.) *Kidney v. Eastside Medical Ctr.*, 343 Ga. App. 401, 408 (4) (a) (806 SE2d 849) (2018) (citing *Nguyen v. Southwestern Emergency Physicians*, *P. C.*, 298 Ga. 75, 81 (2) (c) (779 SE2d 334) (2015)).

The trial court's order found that an issue of material fact precluded summary judgment as to whether the shoulder dystocia in the instant case constituted a medical emergency. The trial court's order noted that although "it was generally understood and agreed by the parties that medical literature suggests the window for relieving a shoulder dystocia is approximately five (5) minutes before a baby may experience serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part," the parties presented conflicting expert testimony as to *when* the medical emergency from a shoulder dystocia begins.

Defendant's point to deposition testimony from the Plaintiffs' obstetrician expert witnesses, Dr. Yvonne Gomez-Garrion and Dr. Rachel McCarter to show that both experts agreed that the newborn was suffering from a shoulder dystocia at the time of the treatment in question. Both experts further agreed that a shoulder dystocia represents a medical and obstetrical emergency because "if a shoulder dystocia cannot be overcome in a timely fashion the baby is at risk of anoxic brain injury and death."

12

Plaintiffs argue that because a shoulder dystocia is a relatively common occurrence during delivery, and because it can be quickly resolved utilizing standard protocols before oxygenation becomes a concern, the shoulder dystocia in the instant case did not constitute a medical emergency because it was resolved in less than a minute. Plaintiffs argue that if Register had done the shoulder dystocia alleviation maneuvers correctly, the baby would have been delivered without her permanent brachial plexus injury. However, although Dr. McCarter deposed that shoulder dystocias are relatively common occurrence in her practice, and that the newborn in the instant case was not at risk for anoxic injury because the length of the shoulder dystocia was only 40-seconds before it was resolved, this testimony does not create an issue of material fact as to whether a shoulder dystocia constitutes a medical emergency. The unrefuted expert testimony in the record is clear that a shoulder dystocia is a medical emergency because unless it is resolved within five minutes, it places the newborn at risk of anoxic brain injury or death.

Because the undisputed evidence in the record demonstrates that there was no factual question that Register provided emergency medical care, as defined by OCGA § 51-1-29.5 (a) (5), to alleviate the shoulder dystocia, the gross negligence standard applies and the Defendants are entitled to summary judgment on that question. See

13

OCGA § 51-1-29.5 (c); *Abdel-Samed*, 294 Ga. at 764-765 (2). Of course, the jury will evaluate the facts and decide whether the Defendants' conduct was grossly negligent – and one relevant fact may be that it only took 40 seconds to resolve the emergency. However, that question is not ours to decide. See *Robles v. Yugueros*, 343 Ga. App. 377, 386-387 (2) (b) (807 SE2d 110) (2017) ("a party may present expert testimony that a physician's actions violated the accepted standard of medical care, and the jury may consider such expert testimony, along with other evidence presented, in deciding whether there was gross negligence").

*Judgment reversed. Reese, P. J., and Markle, J., concur.*