**FIFTH DIVISION
MCFADDEN, P. J.,
BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 26, 2017**

# In the Court of Appeals of Georgia

A17A0806. KIDNEY et al. v. EASTSIDE MEDICAL CENTER
LLC et al.

MCFADDEN, Presiding Judge.

Tiffany Jennings-Perry died from a volvulus, or an abnormal twisting of the intestine causing obstruction.[1] In the days before her death, she twice had gone to the emergency room at Eastside Medical Center, complaining of abdominal pain, but the emergency room doctors had discharged her, finding her condition to be stable.

Gwendolyn Kidney, Jennings-Perry's mother and the executor of her estate, and Thurna Ray Perry, Jr., the father of Jennings-Perry's child, filed this action against the hospital, the two emergency room doctors who saw her and their employers, the radiologist who read her CT scan and his employer, and others. The

---

[1] The American Heritage Medical Dictionary (2007). Retrieved July 26, 2017 from http://medical-dictionary.thefreedictionary.com/volvulus.

trial court granted the motions for summary judgment filed by the hospital, the emergency room doctors and their employers, and the radiologist and his employer. It also denied the plaintiffs' motion to amend the complaint. The plaintiffs appeal.

The plaintiffs argue that the trial court erred by denying their motion to amend the complaint. But they have not shown that the trial court manifestly abused his discretion in denying the motion. The plaintiffs argue that the trial court erred by granting the defendants' motions for summary judgment. We agree with the plaintiffs that disputed issues of fact control whether the heightened evidentiary burden imposed by the emergency medical care statute, OCGA § 51-1-29.5, applies to the claims against these defendants. So we do not reach the doctors' argument that the plaintiffs presented no evidence that they were grossly negligent. But we find that the plaintiffs have failed to point to any evidence of negligence on the part of the hospital or its employees. So we affirm the grant of the hospital's motion for summary judgment. In sum, we affirm the denial of the plaintiffs' motion to amend the complaint, we reverse the grant of summary judgment to the emergency room doctors, the radiologist, and their employers, and we affirm the grant of summary judgment to the hospital.

1. *Facts.*

2

"We review the grant of summary judgment de novo, viewing the evidence in the record, as well as all inferences that might reasonably be drawn from that evidence, in the light most favorable to the non-moving party." *Bonds v. Nesbitt*, 322 Ga. App. 852 (1) (747 SE2d 40) (2013) (citation omitted).

So viewed, the evidence shows that early in the morning of Saturday, April 28, 2012, Jennings-Perry went to Eastside's emergency department because she was experiencing abdominal pain. Jennings-Perry saw nurses, a technician, and defendant John Limehouse, the emergency room physician.

According to Limehouse, Jennings-Perry told him that her pain was moderate. But she told the Eastside nurse who took her history that her pain level was a 10 and then a 9 on a scale from 1 to 10. Limehouse discounted the reliability of Jennings-Perry's report to the nurses about the intensity of her pain based on his interaction with her.

Limehouse was aware that Jennings-Perry had had a Roux-en-Y gastric bypass years before. Limehouse diagnosed Jennings-Perry with "epigastric abdominal pain," or pain at the top of the abdomen, which he characterized as a "nonspecific broad diagnosis" that could encompass more than a thousand different ailments. Because Jennings-Perry's pain was fairly mild, Limehouse testified, she was given viscous

lidocaine to numb the esophagus and stomach, and Mylanta, medicines that were "just above" what a person can get over-the-counter.

Limehouse explained that as an emergency room physician, his job was to rule out acutely life-threatening events and to get the patient to the next step in the treatment algorithm. Based on Jennings-Perry's signs and symptoms, he concluded that her condition was not acutely life-threatening and that she was stable, so he discharged her. He prescribed Vicodin for pain, Zofran for nausea, and Prilosec to heal the lining of the stomach, and instructed her to drink plenty of fluids and to follow up with her doctor in three days, even if she felt well.

Within three hours, Jennings-Perry was returned to the Eastside emergency department by ambulance. Eastside nurses recorded that Jennings-Perry was suffering a 9 and then a 10 out of 10 on the pain intensity scale.

Defendant Kamlesh Gandhi was the emergency room physician who saw Jennings-Perry at this second visit. Gandhi was aware that Jennings-Perry had been to the emergency room earlier and he reviewed the chart of her earlier visit. Jennings-Perry told him that the Vicodin prescribed by Limehouse had not relieved her pain. But Gandhi discounted the reliability of her report of her pain based on his observation: she did not appear to be in that much pain, she was not grimacing in

4

pain, she was not crying, she was talking normally on her cell phone, her vital signs were normal, and she did not exhibit any signs or symptoms of severe pain. Gandhi gave Jennings-Perry Dilaudid for pain and Phenergan for nausea.

Gandhi ordered an ultrasound, thinking that Jennings-Perry's symptoms might be related to her gallbladder, and a CT scan of her abdomen with IV contrast "to rule out any life-threatening situation," such as perforation of the stomach. A technician employed by the hospital performed the CT scan. Defendant radiologist Robert Kubek reviewed the CT scan on his computer screen, but he never met or spoke with Jennings-Perry. Kubek saw nothing that required surgical intervention, admission to the hospital, or further work up. Kubek saw swirling of the mesentery[2] in Jennings-Perry's CT scan, but he did not make a notation of it because he did not believe that it was significant, given the clinical findings as related by Gandhi; he believed that the image simply showed Jennings-Perry's post-gastric bypass anatomy. Kubek explained that a radiologist cannot tell whether a swirling of the mesentery as depicted on a CT scan is acute or nonacute; the findings must be correlated with the

---

[2]The mesentery is "[a]ny of several folds of the peritoneum that connect the intestines to the dorsal abdominal wall." The American Heritage Medical Dictionary (2007). Retrieved July 20, 2017 from http://medical-dictionary.thefreedictionary. com/mesentery.

clinical findings as evaluated by the emergency room physician. According to Kubek, a swirling of the mesentery could indicate an abnormality, such as internal herniation with strangulation of the small bowel, if the patient also has severe abdominal pain or other symptoms.

Kubek and Gandhi discussed Jennings-Perry's clinical history, including that she was experiencing mild pain and that her examination was benign, with, as Kubek described it, "no guarding, no rebound [or reaction to physical touch ], not tender," and they discussed the results of the scan. Kubek told Gandhi that the CT scan was completely normal and unremarkable. According to Gandhi, this ruled out volvulus of the bowels.

But at the time Kubek reviewed Jennings-Perry's CT scan, he did not know that she had visited the emergency department hours before and he did not recall Gandhi telling him how long she had been experiencing pain. Gandhi testified that had he been informed of the swirling of the mesentery, which he considered to be an abnormal finding, he would have consulted with a general surgeon or hospitalist or had Jennings-Perry admitted to the hospital for observation and further studies or re-evaluation.

That was Kubek's and Gandhi's only conversation about Jennings-Perry. Gandhi did not believe that Jennings-Perry was in an immediately life-threatening condition. He determined that Jennings-Perry's medical condition was stable and that her pain had been controlled, so he discharged her from the hospital. Gandhi prescribed Tramadol for pain and instructed her to see a gastroenterologist as soon as possible. Gandhi considered more than a dozen causes for Jennings-Perry's abdominal pain, but he had not reached a specific diagnosis when he discharged her.

On Monday, April 30, 2012, Jennings-Perry was seen by gastroenterologist Sanjay Parikh, a defendant who is not a party to this appeal. He determined that she was sick and needed to be in the hospital. He told her he would directly admit her to the hospital or she could go to the emergency room. She refused both options.

A friend of Jennings-Perry found her dead in her apartment the next day. The medical examiner determined as the cause of death "small intestinal ischemia[3] due to volvulus of small intestine." She determined as another significant condition "remote Roux-en-Y gastric bypass surgery."

---

[3] An ischemia is "[a] decrease in the blood supply to a bodily organ, tissue, or part caused by constriction or obstruction of the blood vessels." The American Heritage Medical Dictionary (2007). Retrieved July 20, 2017 from http://medical-dictionary.thefreedictionary.com/ischemia.

2. *Denial of plaintiffs' motion to amend the complaint.*

The plaintiffs enumerate as error the trial court's denial of their motion to amend their complaint to add a claim under the Federal Emergency Medical Treatment and Active Labor Act, 42 USC § 1395dd, against Eastside. We disagree. (To the extent the plaintiffs argue that the trial court erred by denying their motion to add a claim against Limehouse, Gandhi, and Kubek for violation of the Act, we observe that the record contains no motion to add such a claim against these defendants; the motion only proposed adding the claim against Eastside.)

The trial court entered a case management order that established deadlines including an October 28, 2015 deadline for the filing of all amendments adding counts or parties. In December 2015, the parties filed a joint motion asking the court to extend the deadline to May 1, 2016. In response, on December 8, 2015, the trial court entered an amended case management order, extending the deadline for the filing of amendments to March 31, 2016, a month earlier than the parties had requested but five months later than the original deadline. The plaintiffs filed their motion to amend their complaint and proposed amendment in August 2016.

Generally, "[a] party may amend his pleading as a matter of course and without leave of court at any time before the entry of a pretrial order." OCGA § 9-11-15 (a).

8

However, the plaintiffs filed their motion to amend and the proposed amendment before the entry of a pretrial order but "well after the [March 31, 2016] deadline set forth in the order of [December 2015] which had been entered [in response] to a [joint motion] between the various parties. . . ." *Shedd v. Goldsmith Chevrolet*, 178 Ga. App. 554, 555 (1) (a) (343 SE2d 733) (1986). The case management order was effectively

> a pretrial order as contemplated by OCGA § 9-11-15 and thus [the [plaintiffs] could [not] amend as a matter of right. . . . The order by setting a particular time controlled as to the expiration date for [filing] amendments. By doing this, though not so labeled, it was in effect a pretrial order as to these matters. Moreover by participating in the [joint motion the plaintiffs] waived [their] right to rely on OCGA § 9-11-15 (a) regarding amendments to [their] complaint. [They] apparently so recognized, as [they] thereafter sought leave of court to amend . . . .

*Shedd*, 178 Ga. App. at 555 (1) (a) (citation omitted). See also *Dyals v. Dyals*, 281 Ga. 894, 896 (3) (644 SE2d 138) (2007) (a party cannot complain of error induced by his own conduct).

"Under OCGA § 9-11-15 (a) [], the trial court is given discretion to allow amendments to the pleadings after the entry of a pretrial order . . . , and the appellate court may review such a decision only for manifest abuse of discretion." *Babies Right*

9

*Start v. Ga. Dept. of Pub. Health*, 293 Ga. 553, 556 (2) (b) (748 SE2d 404) (2013) (citation omitted). The plaintiffs argue that because the defendants did not negate the essential facts related to their obligations under the Federal Emergency Medical Treatment and Active Labor Act, the trial court should have granted the motion to amend. They add that it is unfair to allow the defendants to claim the benefits of the emergency medical care statute while preventing the plaintiffs from pursuing a claim based upon the provision of emergency medicine. Neither of these arguments, however, shows how the trial court abused his discretion in adhering to the deadline established at the inducement of the plaintiffs.

3. *Federal Emergency Medical Treatment and Active Labor Act.*

The plaintiffs argue that the trial court erred by granting summary judgment to Eastside on the claim under the Federal Emergency Medical Treatment and Active Labor Act, 42 USC § 1395dd. But as discussed above, the trial court denied the plaintiffs' motion to amend the complaint so the claim under the federal act was not before the court. Nor did Eastside move for summary judgment on the claim. Thus the trial court did not grant summary judgment on the claim, and this argument presents nothing for review.

4. *Heightened evidentiary burden under OCGA § 51-1-29.5.*

10

The plaintiffs argue that the trial court erred by granting summary judgment to the defendants because whether the defendants are entitled to the benefit of the heightened evidentiary burden of the emergency medical care statute, OCGA § 51-1-29.5, depends on disputed issues of fact. We agree. (As discussed in Division 5 below, however, Eastside is entitled to summary judgment on a different ground: that the plaintiffs have failed to point to evidence that any negligence of Eastside's nurses caused or contributed to Jennings-Perry's death.)

OCGA § 51-1-29.5 provides in relevant part:

In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c). Three conditions must be present for the emergency medical care statute to apply:

([1]) the lawsuit must involve a "health care liability claim"; ([2]) the claim must arise out of the provision of "emergency medical care"; and ([3]) the care must have been provided to the patient "in a hospital emergency department or obstetrical unit or in a surgical suite

11

immediately following the evaluation or treatment of a patient in a hospital emergency department."

*Nisbet v. Davis*, 327 Ga. App. 559, 564-565 (1) (760 SE2d 179) (2014) (citation omitted). In this case, whether all of these conditions were present depends on disputed issues of fact.

(a) *Eastside, Limehouse, Gandhi.*

It is undisputed that this lawsuit involves a "health care liability claim," the first condition, and it is clear that the services of Limehouse, Gandhi, and Eastside's employees were provided to Jennings-Perry "in a hospital emergency department," the third condition. The question is whether these defendants were providing "emergency medical care" from which the plaintiffs' claims arose.

The emergency medical care statute defines "emergency medical care" as:

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

12

OCGA § 51-1-29.5 (a) (5). The phrase "bona fide emergency services" as used in the statute "means 'genuine or actual emergency services.' [T]he statute establishes an objective standard on this issue; the health care provider's subjective belief about what kind of care he was providing the patient or what kind of care the patient needed does not determine whether 'bona fide emergency services' were provided." *Nguyen v. Southwestern Emergency Physicians, P.C.*, 298 Ga. 75, 79-80 (2) (b) (779 SE2d 334) (2015) (citations omitted).

> Moreover,
>
> whether the condition of the patient meets the definition of "emergency medical care" is an objective, rather than subjective, test. . . . The patient's actual medical or traumatic condition is determinative — but only as that condition is revealed by the patient's symptoms. The factfinder must consider the evidence regarding the symptoms the patient presented and determine whether those symptoms were acute and sufficiently severe to show that the patient had a medical or traumatic condition that could reasonably be expected to seriously impair her health if not attended to immediately.

*Nguyen*, 298 Ga. at 81 (2) (c) (citation omitted).

The statute excludes from its definition of "emergency medical care" "medical care or treatment that occurs after the patient is stabilized and is capable of receiving

13

medical treatment as a nonemergency patient. . . ." OCGA § 51-1-29.5 (a) (5). So medical care can change from emergency medical care to non-emergency care: "the services provided by [the defendants could have been] 'emergency medical care' until such time as [Jennings-Perry] was stabilized and the absence of such services would not have placed [her] health in serious jeopardy." *Bonds*, 322 Ga. App. at 855 (1).

Neither Dr. Limehouse nor Dr. Gandhi believed that Jennings-Perry's condition was life-threatening. They both determined that her condition was stable, so they discharged her from the emergency room. Viewing the evidence and all reasonable inferences in the light most favorable to the plaintiffs, we conclude that whether Jennings-Perry at some point was "stab[le] and [] capable of receiving medical treatment as a nonemergency patient within the meaning of OCGA § 51-1-29.5 (a) (5) is a question for the trier of fact." *Bonds*, supra, at 856 (1) (punctuation omitted). See also Nguyen, 298 Ga. at 81 (2) (c). The trial court erred by granting summary judgment to Eastside, Limehouse, and Gandhi on the issue of whether the emergency medical care statute applies to the claims against them.

(b) *Kubek*.

Whether Kubek is entitled to the benefits of the emergency medical care statute depends not only on the disputed issue of whether his services were emergency

14

medical care as described in Division 4 (a), but also on the issue of whether his services were provided in a hospital emergency department. "By its ordinary and everyday meaning, care provided 'in a hospital emergency department' is care provided to a patient in a particular location in a hospital." *Nisbet*, 327 Ga. App. at 567 (1) (c). Specifically, "the [emergency medical care] statute applies only when the medical care at issue was provided in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department." *Nguyen*, 298 Ga. at 78 (2) (a) (citation omitted). Although Jennings-Perry remained in the hospital emergency room, the record does not undisputedly show where Kubek provided "the medical care at issue."

The plaintiffs allege that Kubek deviated from the standard of care by failing to recognize and properly report that Jennings-Perry's CT scan was abnormal. Thus, as to Kubek, the "medical care at issue" includes his alleged failure to properly read Jennings-Perry's CT scan as well as his alleged failure to effectively report to Gandhi what he saw in the scan. Kubek read the CT scan in "radiology." He points to no evidence that "radiology" is located in one of the particular locations listed in the statute. He telephoned Gandhi to discuss his findings. It is not clear where either physician was when they spoke by telephone. Given this evidence, where Kubek

15

provided the medical care at issue, whether in a hospital emergency department or elsewhere, is not a matter of undisputed fact. And if he did not provide the medical care at issue in a hospital emergency department, he would not be entitled to the heightened evidentiary burden of the emergency medical care statute. OCGA § 51-1-29.5 (c).

The concurring opinion raises the possibilities of circumstances where a physician consulted by way of tele-medicine technology might be deemed to have been virtually present in an emergency room as emergency services were being provided or a compounding pharmacist might be found to have been subjected to some of the pressures of the emergency room. The questions raised by such circumstances would be substantial. But they are not before us today. On the record before us, a fact finder would be authorized to infer that Dr. Kubek reviewed the CT scans in the relative quiet of his office.

We recognize that in *Nisbet*, we stated that the emergency medical care statute "cover[s] any physician providing emergency medical care to a patient located in the emergency room." Id. at 568 (1) (c). But *Nisbet* does not conclusively answer the question of whether Kubek provided care in a hospital emergency department.

16

First, under its plain terms, the emergency medical care statute applies to "a health care liability claim arising out of *the provision of emergency medical care in a hospital emergency department*," OCGA § 51-1-29.5 (c) — not to a health care liability claim arising out of the provision of emergency medical care *to a patient located* in a hospital emergency department, as *Nisbet* held.

Second, the instant case is factually distinguishable from *Nisbet*. In *Nisbet*, it was not disputed that the physician provided at least some care in the emergency department. *Nisbet*, 327 Ga. App. at 560 ("Dr. Nisbet first saw Mrs. Davis in the emergency department at 8:51 p.m., according to medical records produced by the hospital. Dr. Nisbet spoke with the nurses and Dr. Buchanan, evaluated the x-ray and ultrasound results, and spoke with Mrs. Davis and her husband about her medical history, including her recent surgery."). Here, it is not clear where Kubek was located when he provided care.

Third, the quoted language from *Nisbet* is dicta. The issue in that case was whether the application of the emergency medical care statute "was dependent on the department of the physician responsible for the patient's care [or] the physical location of the patient in the hospital." Id. at 564. *Nisbet* did not address the situation presented here: the patient is physically located in the emergency room but the

17

physician may have provided services remotely. Finally, as noted above, our Supreme Court, albeit in dicta, has stated that "the [emergency medical care] statute applies only when the medical care at issue was provided in a hospital emergency department" *Nguyen*, 298 Ga. at 78 (2) (a) (citation omitted).

For these reasons, the trial court erred by granting summary judgment to Kubek on the issue of whether the emergency medical care statute applies to the claims against him.

*5. Evidence of the nurses' negligence.*

The plaintiffs argue that the trial court erred by granting summary judgment to Eastside because whether the nurses were negligent or grossly negligent and whether any negligence caused or contributed to Jennings-Perry's death depend upon genuine issues of material fact. We find that the plaintiffs have not come forward with sufficient evidence to create a jury question as to whether any conduct of the nurses caused or contributed to Jennings-Perry's death. So the trial court did not err in granting summary judgment to Eastside.

Even where there is evidence of negligence,

a plaintiff cannot recover for medical malpractice . . . unless the plaintiff establishes by a preponderance of the evidence that the negligence either

proximately caused or contributed to cause plaintiff harm. . . . In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury.

*Zwiren v. Thompson*, 276 Ga. 498, 500-501 (578 SE2d 862) (2003) (citations and punctuation omitted).

To hold Eastside liable, the plaintiffs point to the conduct of the two nurses who treated Jennings-Perry at her two visits to the emergency department. They rely on the affidavit of their nursing expert, who testified that the nurses deviated from the standard of care by failing to report Jennings-Perry's continuing unresolved abdominal pain to the emergency department physicians prior to her discharge and by allowing Jennings-Perry to be discharged without assuring themselves that her pain had been relieved. The nursing expert also testified in her affidavit that in her opinion, "within a reasonable degree of certainty . . . the deviations of the standard of care . . . cause[d] or contributed to cause Ms. Jennings-Perry's pain and suffering

19

and death." But the plaintiffs point to no evidence linking the alleged deviations to Jennings-Perry's death.

In her deposition, the nursing expert testified that Carla Bray, the nurse who saw Jennings-Perry at the first visit, should have triaged Jennings-Perry at a more urgent level, but the expert could not say whether the outcome would have been different if Bray had triaged Jennings-Perry at a more urgent level. The expert testified that Bray did not document a complete abdominal assessment, but she admitted that Dr. Limehouse's documentation indicated that Bray did not miss any symptoms. She could not identify any specific thing that was missed because of an allegedly improper assessment.

The expert testified that Bray should have approached Limehouse regarding Jennings-Perry's pain, reconfirming with him whether anything else should be looked at and informing him that she was not comfortable discharging Jennings-Perry, given her pain level. But she admitted that Limehouse was aware of Jennings-Perry's reported pain level and that Bray had noted objective findings — "no acute distress, alert and oriented, patient ambulating without difficulty" — that suggested that Jennings-Perry's reported pain level was not objectively accurate. The expert testified

that Bray should have gone up the chain of command, but she could not with any degree of medical certainty say that anything different would have happened.

The expert testified that nurse Nicole Johnson, who saw Jennings-Perry at her second visit, should have increased the priority level of triage, given that this was Jennings-Perry's second visit, that Jennings-Perry reported her pain as a 10 of 10, and that Jennings-Perry came by ambulance. But the expert admitted that the records indicated that Gandhi immediately saw Jennings-Perry: she arrived at the emergency department at 9:30 a.m. and Gandhi saw her at 9:30 a.m., so the plaintiffs have not pointed to evidence that elevating the priority level of triage would have changed the outcome.

The expert also criticized Johnson for deferring to the doctor's assessment and judgment regarding Jennings-Perry's pain and for failing to go up the chain of command. But the expert could not say that anything different would have happened had Johnson done this.

The plaintiffs have pointed to no evidence that the nurses' alleged negligence "either proximately caused or contributed to cause [Jennings-Perry's] harm." *Zwiren*, 276 Ga. at 500 (citation and punctuation omitted). Accordingly, the trial court did not

err in granting Eastside summary judgment. Compare *Everson v. Phoebe Sumter Med. Center*, 341 Ga. App. 182, 191 (5) (b) (798 SE2d 667) (2017) .

6. *Gross negligence.*

The plaintiffs argue that the trial court erred in granting summary judgment to Limehouse, Gandhi, and Kubek because whether they were negligent or grossly negligent depends upon genuine issues of material fact. The defendants argue only that there are no issues of material fact as to whether they were grossly negligent; they do not counter the plaintiffs' argument that whether they were negligent depends upon genuine issues of material fact.

At this juncture we cannot say whether the heightened evidentiary burden of the emergency medical care statute will apply. Therefore, the issue of whether the plaintiffs have come forward with sufficient evidence of gross negligence to create a question for the factfinder "may well turn out to be moot. Under these circumstances, issuing an opinion [on this issue] would be, in essence, rendering an advisory opinion. However, Georgia appellate courts are not authorized to render advisory opinions as to potential error. Accordingly, we do not reach this issue." *Wellstar Health System v. Sutton*, 318 Ga. App. 802, 805 (3) (734 SE2d 764) (2012)

22

(citations and punctuation omitted). See also *Dempsey v. Gwinnett Hosp. System*, 330 Ga. App. 469, 475 (3) (765 SE2d 525) (2014).

*Judgment affirmed in part, reversed in part. Branch and Bethel, JJ., concur fully in Divisions 1, 2, 3, 5 and 6, and specially in Division 4.*

A17A0806. KIDNEY et al. v. EASTSIDE MEDICAL CENTER
LLC et al.

BETHEL, Judge, concurring specially.

I concur in the judgment of the court, and I concur fully in Divisions 1, 2, 3, 5, and 6. However, while I reach the same conclusion in Division 4, I do not agree with significant portions of the analysis found in that portion of the Presiding Judge's opinion. Accordingly, I concur specially to Division 4.

The record contains evidence that would authorize a fact-finder to conclude that Tiffany Jennings-Perry died on Tuesday, April 31, 2012, as a result of a condition she was suffering from when she visited the emergency department on Saturday, April 28, 2012. The evidence in the record creates genuine issues of material fact concerning whether all of the care she received from the emergency department physicians and the radiologist[1] constituted bona fide emergency service and whether her condition at the time of treatment in the emergency department was for a

---

[1] The identification of genuine issues of material fact concerning the delivery of bona fide emergency services and the presence of a genuine or actual emergent condition apply equally to Dr. Kubek.

condition that required immediate medical attention.[2] Thus, a fact-finder will be required to decide the facts that will, in turn, determine the applicable standard of proof. In as much as Division 4(a) expresses this view of the record and the law, I agree.

But I do not agree with the analysis in Division 4(a) to the extent it suggests the relevance of the physician's assessment of the stability of the patient on this record. As the Presiding Judge notes, Jennings-Perry was discharged upon a determination of her stability. I see no evidence in the record that she received treatment or care from the defendants *following* the determination that she was stable. Absent such evidence, whether the care provided to her by the defendants preceding her discharge qualifies as "emergency medical care" under OCGA § 51-1-29.5 (a) (5) is a question of fact for the jury that should not be informed either way by a physician's assessment of stability at the time of discharge. A physician's assessment

---

[2]Obviously, the volvulus in question was a life threatening condition. This record, however, does not provide conclusive evidence of when the failure to treat it placed Jennings-Perry's life, bodily functions, or organs in serious jeopardy. This question will be reserved for a jury.

2

of stability would only be relevant where there was evidence of additional treatment following the assessment of stability.[3]

I further disagree with the analysis in Division 4(b). I simply cannot agree with the Presiding Judge's analysis that would have the location of the physician (or other care provider) determine the applicability of OCGA § 51-1-29.5 (c). The language of this statutory section provides that

> [i]n an action involving a health care liability claim *arising out of the provision of emergency medical care in a hospital emergency department* . . . , no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c) (emphasis supplied). The Presiding Judge reads "the provision of emergency medical care in a hospital emergency department" in this statute to mean the provision of emergency medical care *by a physician who is also located* in a hospital emergency department. But the statute contains no such restriction, and therefore I believe the Presiding Judge's interpretation to be erroneous.

---

[3]I fully agree with the Presiding Judge that Jennings-Perry has provided evidence sufficient to create a genuine issue of material fact concerning whether at some point during her care during both visits to the Emergency Department she was stable and capable of receiving medical treatment as a non-emergency patient.

In construing OCGA § 51-1-29.5 (c), "we apply the fundamental rules of statutory construction that require us to construe the statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage." *Lakeview Behavioral Health Sys., LLC v. UHS Peachford, LP*, 321 Ga. App. 820, 822 (1) (743 SE2d 492) (2013) (citation omitted). "Thus, a statute should be read according to its natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending its operation." *Id.* (citation and punctuation omitted).

Here, OCGA § 51-1-29.5 (c) applies "to an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department[.]" This statutory language is very broad,[4] and should be interpreted according to its terms without resorting to a reading that forces a limitation not appearing on the face of the statute. Thus, even if the language in *Nisbet* providing that the provision applies to "any physician providing emergency

---

[4] "We have previously construed 'arising out of' to mean 'had its origins in,' 'grew out of,' or 'flowed from.' Moreover, we have also held that the term 'arising out of' does not mean proximate cause in the strict legal sense . . . . Almost any causal connection or relationship will do." *Harrison v. McAfee*, 338 Ga. App. 393, 398 (2) (b) (788 SE2d 872) (2016) (citations omitted).

medical care to a patient located in the emergency room"[5] is *dicta*, it is nevertheless correct. Jennings-Perry received all of her care relevant to this litigation in the emergency department. That satisfies the requirement of the statute that the care must have been provided in a *hospital emergency department*.

When a patient presents in the emergency department with a head trauma and the physician (or other member of the emergency department provider team) calls a local neurosurgeon at her office for urgent consult, that neurosurgeon is treating the patient in the emergency department. When an emergency department nurse calls the hospital pharmacy urgently calling for medicine not present in the emergency department, the pharmacist or technician counting, measuring, or compounding is rendering care to the patient in the emergency department. When the emergency department in a hospital in rural Georgia uses tele-medicine technology to consult with physicians at a large hospital in Atlanta or elsewhere, the physician on the other end of the connection is providing care in that emergency department. Further, suppose in the instant case that Dr. Gandhi had left the emergency department to retrieve an item from a vehicle or had left the emergency department to find an available restroom when Dr. Kubek called to discuss the CT scan results. Are we to

---

[5] *Nisbet v. Davis*, 327 Ga. App. 559, 568 (1) (c) (760 SE2d 170) (2014).

5

believe that Dr. Gandhi would then not be providing care to a patient in the emergency department? No. Such a reading of the statute belies its clear and plain meaning.

A patient is receiving treatment, if at all, where he or she is located.

I am authorized to state that Branch, J. joins in this special concurrence.