# Court of Appeals
# of the State of Georgia

ATLANTA,  June 30, 2023

*The Court of Appeals hereby passes the following order:*

**A23A0398.  WILSON et al. v. INTHACHAK et al.**

There being an equal division of the judges of this Court in connection with the consideration of this case, it is ordered that this case be immediately TRANSFERRED to the Supreme Court of Georgia in accordance with Article VI, Section V, Paragraph V of the Constitution of the State of Georgia.

On dispositive issues, the judges of this Court are equally divided.  Those voting to vacate, and remand: Miller, P, J., Brown, Gobeil, Markle, Hodges, Pipkin, and Land, JJ. Those voting to reverse: Rickman, C. J., Barnes, P. J., Doyle, P. J., Dillard, P. J., McFadden, P. J., Mercier, J., and Senior Appellate Judge Phipps.



*Court of Appeals of the State of Georgia*
*Clerk's Office, Atlanta,  06/30/2023*

*I certify that the above is a true extract from the minutes of the Court of Appeals of Georgia.*

*Witness my signature and the seal of said court hereto affixed the day and year last above written.*

_____ , *Clerk.*

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**

**https://www.gaappeals.us/rules**

**June 30, 2023**

# In the Court of Appeals of Georgia

A23A0398. WILSON et al. v. INTHACHAK et al.

MARKLE, Judge.

In this appeal, we must decide whether a radiologist reading a CT scan from his office miles away from the hospital is entitled to the heightened gross negligence standard applicable under the emergency medical care statute, OCGA § 51-1-29.5 (c). After Dorothy Warren died, her daughter Angela Wilson filed suit against radiologist Dr. Nirandr Inthachak and his medical practice, alleging that he misread Dorothy's CT scan.[1] Dr. Inthachak moved for summary judgment on the issue of whether the

---

[1] Wilson filed suit on behalf of herself, as Dorothy's surviving child, and as administrator of Dorothy's estate.

emergency medical care statute's gross negligence standard applied to his diagnosis. The trial court concluded that it did, and Wilson appeals. For the reasons that follow, we vacate the trial court's order, and remand the case for further proceedings.[2]

> This Court reviews the grant or denial of summary judgment de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. Summary judgment is warranted only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Once the movant has made a prima facie showing that [he] is entitled to judgment as a matter of law, the burden shifts to the respondent to come forward with rebuttal evidence.

(Citation and punctuation omitted.) *Ob-Gyn Assoc., P. A. v. Brown*, 357 Ga. App. 655, 656 (849 SE2d 257) (2020).

So viewed, the record shows that, in January 2018, nursing home resident Dorothy Warren fell and struck her head. She was transported to Clinch Memorial Hospital by non-emergency ambulance transport, and was alert but disoriented upon arrival. Physician assistant John Steigner treated Dorothy in the emergency room, marking her priority level as "routine." He noted hip pain and a bruise on her head. Dorothy's vital signs were normal, and her cognitive evaluation indicated only mild

---

[2] We thank the Georgia Trial Lawyers Association and the Georgia Defense Lawyers Association for their helpful amicus briefs.

3

deficiency. Steigner ordered a routine CT scan.

At the time, Dr. Inthachak was working in his office at another hospital miles away from Clinch Memorial, but received the CT scan and immediately read it remotely. He did not speak with Dorothy, her family, or Steigner at any point during his diagnosis. Dr. Inthachak reported that the CT scan showed a large acute intracerebral hemorrhage.[3]

Based on this diagnosis, Steigner spoke with Dorothy's family, told them she had bleeding in the brain, and explained that her condition was grave. They discussed transferring Dorothy to another hospital for a neurology consultation, but Steigner advised that she might not survive the trip, and even if she did, it was likely that the consulting hospital would send her back to Clinch Memorial. Upon considering the diagnosis, the family decided not to transfer Dorothy and instead opted for comfort measures only. Dorothy died several days later.

Thereafter, Wilson filed suit against Dr. Inthachak, and his practice, Radiology Associates of South Georgia, alleging Dr. Inthachak breached the standard of care by erroneously diagnosing Dorothy's condition as an intracerebral hemorrhage.[4] As

_____

[3] Intracerebral hemmorrhage is bleeding within the brain and is life-threatening. See https://mayfieldclinic.com/pe-ich.htm (last visited May 16, 2023).

[4] Wilson also named as defendants various nursing home entities, but she later settled with those defendants and dismissed them from the suit.

alleged in the complaint, Dorothy actually experienced a treatable subdural hematoma.[5]

Following discovery, Dr. Inthachak moved for summary judgment, arguing that the gross negligence standard applied under the emergency medical care statute. He noted that Dorothy was receiving treatment in the emergency room throughout his involvement in her care and that she was in need of emergent care to treat her condition. In reviewing the emergency medical care statute, Dr. Inthachak argued that it did not require his physical presence in the hospital at the time he made his diagnosis, and there was no testimony that Dorothy was stable at the time of the CT scan. He further asserted that there was no evidence of causation because Steigner, the physician assistant who treated Dorothy, testified in his deposition that both an intracerebral hemorrhage and a subdural hematoma were serious conditions that required a neurology consultation, and he would have made the same recommendations for Dorothy's treatment even if he believed she had experienced

_____

[5] A subdural hematoma is a potentially serious condition in which blood collects between the brain and the skull. See https://my.clevelandclinic.org/health/diseases/21183-subdural-hematoma (last visited May 16, 2023). Unlike an intracerebral hemorrhage, there is no bleeding *in* the brain itself.

a subdural hematoma.[6]

In response, Wilson argued that the emergency medical care statute did not apply because Dorothy was stable at the time of her CT scan, and Dr. Inthachak did not provide medical care "in" the hospital. See OCGA § 51-1-29.5 (c). As to causation, Wilson argued that the misdiagnosis resulted in a more severe prognosis, when the actual condition was treatable. In support, Wilson submitted the deposition of Dr. John Gaughen, a neuro-radiologist who opined that Dr. Inthachak was negligent, and that the misdiagnosis led the family to choose to forego treatment. Gaughen explained that subdural hematomas were not necessarily a medical emergency and were not life-threatening. Wilson also submitted testimony from Dr. Jason Sheehan, who stated that Dorothy likely would have survived if the family had opted for treatment. The family members also testified that they would not have elected to do comfort measures only had they known the condition was less severe and more likely to be treated successfully.

Following a hearing, the trial court granted summary judgment to Dr. Inthachak, finding that the emergency medical care statute applied; Wilson had not met the gross negligence standard; and there was no evidence the outcome would

[6] Dr. Inthachak submitted Steigner's deposition in support of his summary judgment motion.

have been different but for the improper diagnosis. Wilson now appeals.

1. In her first enumeration of error, Wilson contends that the trial court erred by applying the emergency medical care statute to Dr. Inthachak's conduct because he (a) did not provide care "in a hospital emergency department;" and (b) did not render "emergency medical care." OCGA § 51-1-29.5 (c). Although we agree with the trial court that Dr. Inthachak provided care "in an emergency department," we conclude that there is a factual question concerning whether Dorothy received "emergency medical care," and thus Dr. Inthachak was not entitled to summary judgment on this issue.

Under the emergency medical care statute,

> [i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c).[7] There is no dispute that this case involves a health care

---

[7] Where the emergency medical care act does not apply, the physician is subject to the ordinary negligence standard. *Nguyen v. Southwestern Emergency Physicians*, 298 Ga. 75, 77 (2) (779 SE2d 334) (2015).

liability claim. See OCGA § 51-1-29.5 (a) (9). Rather, the parties dispute whether

Dr. Inthachak's made his diagnosis "in a hospital emergency department," and

whether Dorothy received "emergency medical care." To resolve these questions, we

must apply our rules of statutory interpretation.

> When construing statutory language, our analysis must begin with familiar and binding canons of construction. First and foremost, in considering the meaning of a statute, our charge as an appellate court is to presume that the legislature meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. In summary, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.

(Citation omitted.) *Ob-Gyn Assoc.*, 357 Ga. App. at 657 (1).

---

> "Gross negligence" is defined as the absence of even slight diligence, and slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence is equivalent to the failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise.

(Citation omitted.) *Nisbet v. Davis*, 327 Ga. App. 559, 568-569 (2) (760 SE2d 179) (2014).

8

But when the language of a statute or regulation is not obvious on its face, we should employ other tools of construction to interpret it and resolve its meaning. Those rules require that we give due weight and meaning to all of the words of the statute, and we are not authorized to disregard any of the words of the statute in question unless the failure to do so would lead to an absurdity manifestly not intended by the legislature. In addition, language in one part of the statute must be construed in light of the legislature's intent as found in the whole statute.

(Citations and punctuation omitted.) *PTI Royston, LLC v. Eubanks*, 360 Ga. App. 263, 266-267 (1) (861 SE2d 115) (2021). And, when we engage in statutory construction, we presume that the General Assembly was aware of existing laws at the time it enacted the statute at issue. Id. at 268 (1). With this guidance in mind, we turn to the issue on appeal.

(a) *Whether Dr. Inthachak provided care "in a hospital emergency department."*

To be entitled to the protections of the emergency medical care statute, Dr. Inthachak must show that he provided care "in a hospital emergency department." OCGA § 51-1-29.5 (c). Wilson contends that it is the location of the physician giving the medical care, not the location of the patient that is determinative, and in this case Dr. Inthachak was not located in the hospital at the time of his diagnosis. We disagree

9

and conclude that the trial court properly determined that Dr. Inthachak satisfied this prong of the statute.[8]

We have never answered the precise question before us in a binding opinion. In *Kidney v. Eastside Medical Center*, 343 Ga. App. 401, 408-410 (4) (b) (806 SE2d 849) (2017) (physical precedent only), the judges on the panel disagreed on whether the statute required the physician to be in the emergency room at the time he provided care to be entitled to the statute's protection. Id. at 409 (4) (b), 414-415. We must now resolve this issue.

We begin with the plain language of the text. The statute provides for a heightened standard of care for injuries resulting from "the provision of emergency medical care in a hospital emergency department[.]" OCGA § 51-1-29.5 (c). Nothing in the text requires the physician be located in the hospital; it requires only that the medical care be provided in the hospital. Our rules of statutory construction dictate that we read words in their most natural way, and we are not permitted to add language to the statute. *Ob-Gyn Assoc.*, 357 Ga. App. at 657 (1); *Moosa Co. v. Commr. of the Ga. Dept. of Revenue*, 353 Ga. App. 429, 432 (838 SE2d 108) (2020) ("[t]his court cannot add language to a statute by judicial decree.") (citation omitted);

---

[8] As the trial court noted, other states have concluded that the statute would apply to a physician who provided a diagnosis remotely. See, e.g., *Turner v. Franklin*, 325 SW3d 771, 774-775, 778-780 (2) (Ct. App. Tx. 2010).

*Brooks v. Brooks*, 185 Ga. 549, 554 (195 SE 869) (1937) ("A court should never by construction add to, take from, or vary the meaning of unambiguous words in a statute."). Thus, we cannot interpret this statutory provision to read as if it included the words "by a physician physically located in the hospital emergency department."

Instead, when we engage in statutory interpretation, we read the statute as a whole, mindful that "[a] phrase found in a statute must be gauged by the words surrounding it." (Citation and punctuation omitted.) *Nisbet v. Davis*, 327 Ga. App. 559, 567 (1) (760 SE2d 179) (2014); see also *Anderson v. Southeastern Fidelity Ins. Co.*, 251 Ga. 556 (307 SE2d 499) (1983) ("Words, like people, are judged by the company they keep."). As we explained in *Nisbet*,

> [b]y its ordinary and everyday meaning, care provided "in a hospital emergency department" is care provided *to a patient in a particular location in a hospital*. . . . The General Assembly's use of the phrase "in a hospital emergency department" to mean *the physical location in which a patient is treated* is further reflected by its inclusion in the statute of two other locations within which a patient may be treated for an emergency. . . . The reference to two other physical locations within the hospital in the same sentence of the statute further buttresses our conclusion that the phrase "in a hospital emergency department" refers to a physical location within the hospital.

(Citations and punctuation omitted; emphasis supplied.) 327 Ga. App. at 567 (1) (c). Thus, when we read the statute in context, we must conclude that it intended to cover

11

care given to the patient, who must be located in the emergency department. Id.; see also *Kidney*, 343 Ga. App. at 415 ("[a] patient is receiving treatment, if at all, where he or she is located.").[9] Our Supreme Court implicitly recognized this interpretation in *Nguyen v. Southwestern Emergency Physicians*, 298 Ga. 75, 79 (2) (a) (779 SE2d 334) (2015), explaining "[i]t is clear that the ER statute applies only when *the medical care at issue was provided 'in a hospital emergency department.'*"(citation omitted; emphasis supplied).

We are further persuaded that the statute intended to require only the patient's presence in the hospital when we consider the statute's history. The General Assembly enacted the Emergency Medical Care Act in 2005 as part of its tort reform legislation, primarily to address practioners' difficulty in obtaining liability insurance that was also impacting the availability of health care services. See Ga. L. 2005, Act 1, §§ 1, 10. That same year, the General Assembly passed legislation allowing telemedicine services, specifically to provide for insurance coverage of telemedicine, to "mitigate geographic discrimination in the delivery of health care." OCGA § 33-24-56.4 (b) (3), (c), (g); Ga. L. 2005, Act 82, § 3. The General Assembly would have

---

[9] Interestingly, the defendants in *Kidney* filed a petition for certiorari following our decision, raising the issue of whether the statute required the physician to be present in the emergency room, but the Supreme Court denied review. See *Kubek et al. v. Kidney et al.*, Case No. S18C0468 (denied May 7, 2018).

been aware of this telemedicine statute at the time it enacted the Emergency Medical Care Act. *PTI Royston*, 360 Ga. App. at 268 (1). And when we view these statutes together, we are left with the understanding that the emergency room statute was intended to cover physicians physically located outside the hospital as long as the care provided was rendered to a patient who was present in the emergency department. See *Gray v. State*, 310 Ga. 259, 261-262 (2) (850 SE2d 36) (2020) ("The primary determinant of a text's meaning is its context. For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question.") (citations and punctuation omitted).

Finally, although we are limited to construing the statute at the time of its enactment, see *Gray*, 310 Ga. at 265 (3), n. 6, we note that in the most recent amendments to the telemedicine statute, the General Assembly added language stating that the statute does not "alter, or expand the . . . standard of care . . . for healthcare providers . . . *other than as provided in applicable . . . state laws, rules, and regulations*." OCGA § 33-24-56.4 (p) (2021). Importantly, this amendment post-dates our decision in *Kidney*. We may thus consider this language to include the heightened standard of care in the emergency medical care statute. Therefore, it

13

confirms that the General Assembly intended for the gross negligence standard to apply to telemedicine providers — in other words, those physicians who provide care from a location other than the emergency room. See *Country Club Apts. v. Scott*, 246 Ga. 443, 444 (271 SE2d 841) (1980) ("the General Assembly can acquiesce in court interpretations of its enactments by failing or declining to amend them so as to clarify its true intention[.]"). As a result, the trial court properly found that Dr. Inthachak was providing care "in a hospital emergency department" at the time of his diagnosis, as required under OCGA § 51-1-29.5 (c).

This conclusion does not end our analysis, however, because Dr. Inthachak must also show that he provided emergency medical care in order to be entitled to the statute's heightened standard of care.

(b) *Whether Dr. Inthachak provided emergency medical care.*

Wilson argues that the trial court erred by finding, as a matter of law, that Dorothy was in need of emergency medical care because her symptoms were not sufficiently severe prior to Dr. Inthachak's involvement. She contends that whether Dorothy required emergency medical care was a question for the jury. We agree that this question must be answered by the factfinder.

"Emergency medical care" is defined as

bona fide emergency services provided after the onset of a medical or

traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5). Our Supreme Court has explained that this determination is objective, and it is the *factfinder* that must make it.

> The patient's actual medical or traumatic condition is determinative—but only as that condition is revealed by the patient's symptoms. The factfinder must consider the evidence regarding the symptoms the patient presented and determine whether those symptoms were acute and sufficiently severe to show that the patient had a medical or traumatic condition that could reasonably be expected to seriously impair her health if not attended to immediately. Although the health care provider's subjective opinion about the patient's condition is not controlling, it is relevant as evidence of the patient's condition.

*Nguyen*, 298 Ga. at 81 (c).

Here, the record shows that Dorothy was transported by non-emergency ambulance to the hospital; she was alert with mild cognitive deficiency upon arrival; her vital signs were normal and her symptoms were mild; her primary complaint was

15

hip pain; and all of the tests, including the CT scan, were marked as routine priority. Steigner also marked her priority level as "routine," and the medical record indicates that there were no severe symptoms upon arrival. Given this evidence, the trial court erred in finding, *as a matter of law*, that Dorothy required "emergency medical care" as that term is defined in the statute. See OCGA § 51-1-29.5 (a) (5).

Dr. Inthachak urges us to conclude that Dorothy presented as an emergency patient because she was unable to walk and had bleeding on the brain. But this argument ignores that we are to view the severity of the symptoms at the time Dorothy presented to the emergency room and not after the CT scan.[10] *Nguyen*, 298 Ga. at 81-82 (2) (c); *Ob-Gyn Assoc.*, 357 Ga. App. at 660-661 (2).

Here, there is at least some evidence that Dorothy was stable at the time of her arrival. Steigner's opinion of Dorothy's medical status may be relevant to the determination of whether Dorothy required "emergency medial care," but the question is properly answered by the factfinder. *Nguyen*, 298 Ga. at 81 (2) (c); see also *Connie v. Garnett*, 360 Ga. App. 24, 29-30 (2) (b) (860 SE2d 592) (2021) (disputed facts regarding severity of patient's symptoms created factual question); *Hosp. Auth. of Valdosta/Lowndes County v. Brinson*, 330 Ga. App. 212, 221 (767 SE2d 811) (2014)

---

[10] Wilson concedes that Dorothy's condition required emergency medical care *after* Dr. Inthachak's diagnosis.

16

(fact question on patient's medical condition made summary judgment improper); compare *Nisbet*, 327 Ga. App. at 565-566 (1) (b) (undisputed evidence showed emergency medical care was provided where patient was triaged as emergency patient, blood work showed acute renal failure, and requests for consultations were marked as critical status). Accordingly, the trial court erred by concluding otherwise as a matter of law.

2. Wilson next argues that the trial court erred by finding there was no factual question as to causation because she presented evidence that Dorothy's condition was treatable and that the family would have opted for more aggressive care if they had known the correct diagnosis. We agree that a jury question remains on this issue.

In general, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Punctuation and footnote omitted.) *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014). We cannot say that this is such a plain and indisputable case.

Dr. Inthachak argues that Wilson cannot raise a factual question on causation because Steigner testified he would have made the same recommendation even if Dr. Inthachak had diagnosed Dorothy with a subdural hematoma. But Wilson presented expert testimony that a subdural hematoma was a treatable diagnosis, and there was testimony from Dorothy's family that they would have opted for more care,

17

including a transfer to another hospital, had they known the correct diagnosis. Construing the evidence in Wilson's favor, as we must, this testimony is sufficient to raise a jury question on causation. See, e. g., *Adams v. Piedmont Henry Hosp.*, 365 Ga. App. 257, 268 (1) (878 SE2d 113) (2022) (jury question on causation where there was testimony that nurse's failure to report symptoms to doctor breached the standard of care and resulted in doctor's failure to provide treatment that could have prevented patient's death); *Orr v. SSC Atlanta Operating Co.*, 360 Ga. App. 702, 709 (2) (860 SE2d 217) (2021) (trial court erred in granting summary judgment on causation based on its finding that doctor would not have made different treatment decision if he had additional information because it was not court's role to weigh the evidence); *Mekoya v. Clancy*, 360 Ga. App. 452, 463-464 (2) (861 SE2d 409) (2021) (question of causation for the jury where there was expert testimony that patient's condition could have been prevented if doctor had made proper diagnosis); *Evans v. The Medical Center of Central Ga.*, 359 Ga. App. 797, 800-802 (860 SE2d 100) (2021) (nurse's conduct, which breached standard of care, contributed to decision to discharge patient prematurely, which caused his death); compare *Reeves v. Mahathre*, 328 Ga. App. 546, 549-551 (759 SE2d 926) (2014) (physical precedent only) (finding no jury question on causation where doctor testified he would have made same treatment decision if he had known correct diagnosis and there was no expert testimony to

18

establish causation). Accordingly, the trial court erred by granting summary judgment on this basis.

In sum, the trial court properly concluded that Dr. Inthachak provided care in the hospital emergency department, but factual questions remain as to whether he provided "emergency medical care" and as to causation. For these reasons, we vacate the trial court's order, and remand the case for further proceedings consistent with this opinion.

*Judgment vacated, and case remanded. Miller, P.J., Brown, Gobeil, Hodges, Pipkin, and Land, JJ. concur. Rickman, C. J., Barnes, P.J., Dillard, P.J. McFadden, P. J., Mercier, J., and Senior Appellate Judge Phipps concur in part and dissent in part. Doyle, P.J. joins the partial dissent in judgment only.*

# In the Court of Appeals of Georgia

A23A0398. WILSON et al. v. INTHACHAK et al.

MᴄFᴀᴅᴅᴇɴ, Presiding Judge, concurring in part and dissenting in part.

A doctor provides care. A patient receives care. The emergency medical care statute uses the term "provision," a form of "to provide." OCGA § 51-1-29.5 (c). So the statute's applicability turns on the location where the care was provided, not where it was received.

The function of the statute confirms that interpretation. The General Assembly determined that health care providers alleged to have committed malpractice "in a hospital emergency department" should have the benefits of a lower standard of care

2

and a higher burden of proof than other providers. OCGA § 51-1-29.5 (c). Dr. Inthachak examined the CT scans in the relative quiet of his office and caused the results to be transmitted by facsimile.

For those reasons, I respectfully dissent from Division 1. See *Kidney v. Eastside Med. Center*, 343 Ga. App. 401, 408-410 (4) (b) (806 SE2d 849) (2017) (physical precedent only). I concur in Division 2. The order granting summary judgment should be reversed.

I am authorized to state that Rickman, C. J., Barnes, P. J., Dillard, P. J., Mercier, J. and Senior Appellate Judge Phipps join in this partial dissent. I am authorized to state that Doyle, P. J. concurs in judgment only as to this partial dissent.