**WHOLE COURT**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 8, 2024**

# In the Court of Appeals of Georgia

A23A0398. WILSON et al. v. INTHACHAK et al.

MARKLE, Judge.

In this appeal, we must decide whether a radiologist reading a CT scan from his office miles away from the hospital is entitled to the heightened gross negligence standard applicable under the emergency medical care statute, OCGA § 51-1-29.5 (c). After Dorothy Warren died, her daughter Angela Wilson filed suit against radiologist Dr. Nirandr Inthachak and his medical practice, alleging that he misread Dorothy's CT scan.[1] Dr. Inthachak moved for summary judgment on the issue of whether the emergency medical care statute's gross negligence standard applied to his diagnosis.

---

[1] Wilson filed suit on behalf of herself, as Dorothy's surviving child, and as administrator of Dorothy's estate.

The trial court concluded that it did, and Wilson appeals. For the reasons that follow, we vacate the trial court's order, and remand the case for further proceedings.[2]

> This Court reviews the grant or denial of summary judgment de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. Summary judgment is warranted only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Once the movant has made a prima facie showing that [he] is entitled to judgment as a matter of law, the burden shifts to the respondent to come forward with rebuttal evidence.

(Citation and punctuation omitted.) *Ob-Gyn Assoc., P. A. v. Brown*, 357 Ga. App. 655, 656 (849 SE2d 257) (2020).

So viewed, the record shows that, in January 2018, nursing home resident Dorothy Warren fell and struck her head. She was transported to Clinch Memorial Hospital by non-emergency ambulance transport, and was alert but disoriented upon arrival. Physician assistant John Steigner treated Dorothy in the emergency room, marking her priority level as "routine." He noted hip pain and a bruise on her head.

---

[2] We thank the Georgia Trial Lawyers Association and the Georgia Defense Lawyers Association for their helpful amicus briefs.

Dorothy's vital signs were normal, and her cognitive evaluation indicated only mild deficiency. Steigner ordered a routine CT scan.

At the time, Dr. Inthachak was working in his office at another hospital miles away from Clinch Memorial, but received the CT scan and immediately read it remotely. He did not speak with Dorothy, her family, or Steigner at any point during his diagnosis. Dr. Inthachak reported that the CT scan showed a large acute intracerebral hemorrhage.[3]

Based on this diagnosis, Steigner spoke with Dorothy's family, told them she had bleeding in the brain, and explained that her condition was grave. They discussed transferring Dorothy to another hospital for a neurology consultation, but Steigner advised that she might not survive the trip, and even if she did, it was likely that the consulting hospital would send her back to Clinch Memorial. Upon considering the diagnosis, the family decided not to transfer Dorothy and instead opted for comfort measures only. Dorothy died several days later.

Thereafter, Wilson filed suit against Dr. Inthachak, and his practice, Radiology Associates of South Georgia, alleging Dr. Inthachak breached the standard of care by

---

[3] Intracerebral hemmorrhage is bleeding within the brain and is life-threatening. See https://mayfieldclinic.com/pe-ich.htm (last visited May 16, 2023).

erroneously diagnosing Dorothy's condition as an intracerebral hemorrhage.[4] As alleged in the complaint, Dorothy actually experienced a treatable subdural hematoma.[5]

Following discovery, Dr. Inthachak moved for summary judgment, arguing that the gross negligence standard applied under the emergency medical care statute. He noted that Dorothy was receiving treatment in the emergency room throughout his involvement in her care and that she was in need of emergent care to treat her condition. In reviewing the emergency medical care statute, Dr. Inthachak argued that it did not require his physical presence in the hospital at the time he made his diagnosis, and there was no testimony that Dorothy was stable at the time of the CT scan. He further asserted that there was no evidence of causation because Steigner, the physician assistant who treated Dorothy, testified in his deposition that both an intracerebral hemorrhage and a subdural hematoma were serious conditions that

---

[4] Wilson also named as defendants various nursing home entities, but she later settled with those defendants and dismissed them from the suit.

[5] A subdural hematoma is a potentially serious condition in which blood collects between the brain and the skull. See https://my.clevelandclinic.org/health/diseases/21183-subdural-hematoma (last visited May 16, 2023). Unlike an intracerebral hemorrhage, there is no bleeding *in* the brain itself.

required a neurology consultation, and he would have made the same recommendations for Dorothy's treatment even if he believed she had experienced a subdural hematoma.[6]

In response, Wilson argued that the emergency medical care statute did not apply because Dorothy was stable at the time of her CT scan, and Dr. Inthachak did not provide medical care "in" the hospital. See OCGA § 51-1-29.5 (c). As to causation, Wilson argued that the misdiagnosis resulted in a more severe prognosis, when the actual condition was treatable. In support, Wilson submitted the deposition of Dr. John Gaughen, a neuro-radiologist who opined that Dr. Inthachak was negligent, and that the misdiagnosis led the family to choose to forego treatment. Gaughen explained that subdural hematomas were not necessarily a medical emergency and were not life-threatening. Wilson also submitted testimony from Dr. Jason Sheehan, who stated that Dorothy likely would have survived if the family had opted for treatment. The family members also testified that they would not have elected to do comfort measures only had they known the condition was less severe and more likely to be treated successfully.

---

[6] Dr. Inthachak submitted Steigner's deposition in support of his summary judgment motion.

Following a hearing, the trial court granted summary judgment to Dr. Inthachak, finding that the emergency medical care statute applied; Wilson had not met the gross negligence standard; and there was no evidence the outcome would have been different but for the improper diagnosis. Wilson now appeals.

1. In her first enumeration of error, Wilson contends that the trial court erred by applying the emergency medical care statute to Dr. Inthachak's conduct because he (a) did not provide care "in a hospital emergency department;" and (b) did not render "emergency medical care." OCGA § 51-1-29.5 (c). Although we agree with the trial court that Dr. Inthachak provided care "in an emergency department," we conclude that there is a factual question concerning whether Dorothy received "emergency medical care," and thus Dr. Inthachak was not entitled to summary judgment on this issue.

Under the emergency medical care statute,

[i]n an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is

6

proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (c).[7] There is no dispute that this case involves a health care liability claim. See OCGA § 51-1-29.5 (a) (9). Rather, the parties dispute whether Dr. Inthachak made his diagnosis "in a hospital emergency department," and whether Dorothy received "emergency medical care." To resolve these questions, we must apply our rules of statutory interpretation.

> When construing statutory language, our analysis must begin with familiar and binding canons of construction. First and foremost, in considering the meaning of a statute, our charge as an appellate court is

---

[7] Where the emergency medical care act does not apply, the physician is subject to the ordinary negligence standard. *Nguyen v. Southwestern Emergency Physicians*, 298 Ga. 75, 77 (2) (779 SE2d 334) (2015).

> "Gross negligence" is defined as the absence of even slight diligence, and slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence is equivalent to the failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise.

(Citation omitted.) *Nisbet v. Davis*, 327 Ga. App. 559, 568-569 (2) (760 SE2d 179) (2014).

to presume that the legislature meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. In summary, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.

(Citation omitted.) *Ob-Gyn Assoc.*, 357 Ga. App. at 657 (1).

But when the language of a statute or regulation is not obvious on its face, we should employ other tools of construction to interpret it and resolve its meaning. Those rules require that we give due weight and meaning to all of the words of the statute, and we are not authorized to disregard any of the words of the statute in question unless the failure to do so would lead to an absurdity manifestly not intended by the legislature. In addition, language in one part of the statute must be construed in light of the legislature's intent as found in the whole statute.

(Citations and punctuation omitted.) *PTI Royston, LLC v. Eubanks*, 360 Ga. App. 263, 266-267 (1) (861 SE2d 115) (2021). And, when we engage in statutory construction, we presume that the General Assembly was aware of existing laws at the time it enacted the statute at issue. Id. at 268 (1). With this guidance in mind, we turn to the issues on appeal.

(a) *Whether Dr. Inthachak provided care "in a hospital emergency department."*

To be entitled to the protections of the emergency medical care statute, Dr. Inthachak must show that he provided care "in a hospital emergency department." OCGA § 51-1-29.5 (c). Wilson contends that it is the location of the physician giving the medical care, not the location of the patient that is determinative, and in this case Dr. Inthachak was not located in the hospital at the time of his diagnosis. We disagree and conclude that the trial court properly determined that Dr. Inthachak satisfied this prong of the statute.[8]

We have never answered the precise question before us in a binding opinion. In *Kidney v. Eastside Medical Center*, 343 Ga. App. 401, 408-410 (4) (b) (806 SE2d 849) (2017) (physical precedent only), the judges on the panel disagreed on whether the statute required the physician to be in the emergency room at the time he provided care to be entitled to the statute's protection. Id. at 409 (4) (b), 414-415. We must now resolve this issue.[9]

---

[8] As the trial court noted, other states have concluded that the statute would apply to a physician who provided a diagnosis remotely. See, e.g., *Turner v. Franklin*, 325 SW3d 771, 774-775, 778-780 (2) (Ct. App. Tx. 2010).

[9] In his dissent, Presiding Judge Dillard cites to *Kidney* for the holding that the statute requires the physician be physically located in the emergency room. But, that

We begin with the plain language of the text. The statute provides for a heightened standard of care for injuries resulting from "the provision of emergency medical care in a hospital emergency department[.]" OCGA § 51-1-29.5 (c). Nothing in the text requires the physician be located in the hospital; it requires only that the medical care be provided in the hospital. Our rules of statutory construction dictate that we read words in their most natural way, and we are not permitted to add language to the statute. *Ob-Gyn Assoc.*, 357 Ga. App. at 657 (1); *Moosa Co. v. Commr. of the Ga. Dept. of Revenue*, 353 Ga. App. 429, 432 (838 SE2d 108) (2020) ("[t]his court cannot add language to a statute by judicial decree.") (citation omitted); *Brooks v. Brooks*, 185 Ga. 549, 554 (195 SE 869) (1937) ("A court should never by construction add to, take from, or vary the meaning of unambiguous words in a

---

was not the holding in *Kidney*. Although Presiding Judge McFadden wrote that the statute required the physician's physical presence, Judges Bethel and Branch expressly disagreed with that analysis, concluding instead, as we do, that the proper statutory interpretation requires only the physical presence of the patient in the hospital emergency room. See *Kidney*, 343 Ga. App. at 409-410 (4) (b) (McFadden, P. J.), 413-415 (Bethel, J., concurring specially). If *Kidney* is persuasive authority, it supports the majority's analysis in the instant case.

statute."). Thus, we cannot interpret this statutory provision to read as if it included

the words "by a physician physically located in the hospital emergency department."[10]

Instead, when we engage in statutory interpretation, we read the statute as a

whole, mindful that "[a] phrase found in a statute must be gauged by the words

surrounding it." (Citation and punctuation omitted.) *Nisbet v. Davis*, 327 Ga. App.

559, 567 (1) (760 SE2d 179) (2014); see also *Anderson v. Southeastern Fidelity Ins. Co.*,

251 Ga. 556 (307 SE2d 499) (1983) ("Words, like people, are judged by the company

they keep."). As we explained in *Nisbet*,

> [b]y its ordinary and everyday meaning, care provided "in a hospital
> emergency department" is care provided *to a patient in a particular
> location in a hospital.* . . . The General Assembly's use of the phrase "in
> a hospital emergency department" to mean *the physical location in which
> a patient is treated* is further reflected by its inclusion in the statute of two
> other locations within which a patient may be treated for an emergency.
> . . . The reference to two other physical locations within the hospital in

---

[10] As then-judge Bethel explained, "the statute contains no such restriction" and the statutory language "should be interpreted according to its terms without resorting to a reading that forces a limitation not appearing on the face of the statute." *Kidney*, 343 Ga. App. at 414 (Bethel, J., concurring specially). Thus, where a patient has received the care at issue in the emergency department, "[t]hat satisfies the requirement of the statute that the care must have been provided in a hospital emergency department." Id. at 414-415 (Bethel, J., concurring specially) (emphasis omitted).

the same sentence of the statute further buttresses our conclusion that the phrase "in a hospital emergency department" refers to a physical location within the hospital.

(Citations and punctuation omitted; emphasis supplied.) 327 Ga. App. at 567 (1) (c). Moreover, the statute applies to "*claims arising out of* the provision of medical care in a hospital emergency department." OCGA § 51-1-29.5 (c). Dr. Inthachak's participation in this case *arose* from the medical care Dorothy received while she was in the emergency room. See *Kidney*, 343 Ga. App. at 415 (Bethel, J., concurring specially); see also *Nisbet*, 327 Ga. App. at 568 (1) (c) ("the uncontroverted evidence shows that [the physician] was providing care and treatment to [the patient] while she was physically located in the hospital emergency department. . . . Accordingly, the emergency medical care statute applies as a matter of law"). Thus, when we read the statute in context, we must conclude that it intended to cover care given to the patient, who must be located in the emergency department. Id.; see also *Kidney*, 343 Ga. App. at 415 ("[a] patient is receiving treatment, if at all, where he or she is located.").[11] Our

---

[11] Interestingly, the defendants in *Kidney* filed a petition for certiorari following our decision, raising the issue of whether the statute required the physician to be present in the emergency room, but the Supreme Court denied review. See *Kubek et al. v. Kidney et al.*, Case No. S18C0468 (denied May 7, 2018).

Supreme Court implicitly recognized this interpretation in *Nguyen v. Southwestern Emergency Physicians*, 298 Ga. 75, 79 (2) (a) (779 SE2d 334) (2015), explaining "[i]t is clear that the ER statute applies only when *the medical care at issue was provided 'in a hospital emergency department.*'" (citation omitted; emphasis supplied).

We are further persuaded that the statute intended to require only the patient's presence in the hospital when we consider the statute's history. The General Assembly enacted the Emergency Medical Care Act in 2005 as part of its tort reform legislation, primarily to address practioners' difficulty in obtaining liability insurance that was also impacting the availability of health care services. See Ga. L. 2005, Act 1, §§ 1, 10. That same year, the General Assembly passed legislation allowing telemedicine services, specifically to provide for insurance coverage of telemedicine, to "mitigate geographic discrimination in the delivery of health care." OCGA § 33-24-56.4 (b) (3), (c), (g); Ga. L. 2005, Act 82, § 3. The General Assembly would have been aware of this telemedicine statute at the time it enacted the Emergency Medical Care Act. *PTI Royston*, 360 Ga. App. at 268 (1). And when we view these statutes together, we are left with the understanding that the emergency room statute was

13

intended to cover physicians physically located outside the hospital as long as the care provided was rendered to a patient who was present in the emergency department. See *Gray v. State*, 310 Ga. 259, 261-262 (2) (850 SE2d 36) (2020) ("The primary determinant of a text's meaning is its context. For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question.") (citations and punctuation omitted).

Finally, although we are limited to construing the statute at the time of its enactment, see *Gray*, 310 Ga. at 265 (3), n. 6, we note that in the most recent amendments to the telemedicine statute, the General Assembly added language stating that the statute does not "alter, or expand the . . . standard of care . . . for healthcare providers . . . *other than as provided in applicable . . . state laws, rules, and regulations.*" OCGA § 33-24-56.4 (p) (2021). Importantly, this amendment post-dates our decision in *Kidney*. We may thus consider this language to include the heightened standard of care in the emergency medical care statute. Therefore, it confirms that the General Assembly intended for the gross negligence standard to apply to telemedicine

14

providers — in other words, those physicians who provide care from a location other than the emergency room. See *Country Club Apts. v. Scott*, 246 Ga. 443, 444 (271 SE2d 841) (1980) ("the General Assembly can acquiesce in court interpretations of its enactments by failing or declining to amend them so as to clarify its true intention[.]"). As a result, the trial court properly found that Dr. Inthachak was providing care "in a hospital emergency department" at the time of his diagnosis, as required under OCGA § 51-1-29.5 (c).

This conclusion does not end our analysis, however, because Dr. Inthachak must also show that he provided emergency medical care in order to be entitled to the statute's heightened standard of care.

(b) *Whether Dr. Inthachak provided emergency medical care.*

Wilson argues that the trial court erred by finding, as a matter of law, that Dorothy was in need of emergency medical care because her symptoms were not sufficiently severe prior to Dr. Inthachak's involvement. She contends that whether Dorothy required emergency medical care was a question for the jury. We agree that this question must be answered by the factfinder.

"Emergency medical care" is defined as

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5). Our Supreme Court has explained that this determination is objective, and it is the *factfinder* that must make it.

The patient's actual medical or traumatic condition is determinative—but only as that condition is revealed by the patient's symptoms. The factfinder must consider the evidence regarding the symptoms the patient presented and determine whether those symptoms were acute and sufficiently severe to show that the patient had a medical or traumatic condition that could reasonably be expected to seriously impair her health if not attended to immediately. Although the health care provider's subjective opinion about the patient's condition is not controlling, it is relevant as evidence of the patient's condition.

*Nguyen*, 298 Ga. at 81 (c).

Here, the record shows that Dorothy was transported by non-emergency ambulance to the hospital; she was alert with mild cognitive deficiency upon arrival; her vital signs were normal and her symptoms were mild; her primary complaint was hip pain; and all of the tests, including the CT scan, were marked as routine priority. Steigner also marked her priority level as "routine," and the medical record indicates that there were no severe symptoms upon arrival. Given this evidence, the trial court erred in finding, *as a matter of law*, that Dorothy required "emergency medical care" as that term is defined in the statute. See OCGA § 51-1-29.5 (a) (5).

Dr. Inthachak urges us to conclude that Dorothy presented as an emergency patient because she was unable to walk and had bleeding on the brain. But this argument ignores that we are to view the severity of the symptoms at the time Dorothy presented to the emergency room and not after the CT scan.[12] *Nguyen*, 298 Ga. at 81-82 (2) (c); *Ob-Gyn Assoc.*, 357 Ga. App. at 660-661 (2).

Here, there is at least some evidence that Dorothy was stable at the time of her arrival. Steigner's opinion of Dorothy's medical status may be relevant to the determination of whether Dorothy required "emergency medial care," but the

---

[12] Wilson concedes that Dorothy's condition required emergency medical care *after* Dr. Inthachak's diagnosis.

17

question is properly answered by the factfinder. *Nguyen*, 298 Ga. at 81 (2) (c); see also *Connie v. Garnett*, 360 Ga. App. 24, 29-30 (2) (b) (860 SE2d 592) (2021) (disputed facts regarding severity of patient's symptoms created factual question); *Hosp. Auth. of Valdosta/Lowndes County v. Brinson*, 330 Ga. App. 212, 221 (767 SE2d 811) (2014) (fact question on patient's medical condition made summary judgment improper); compare *Nisbet*, 327 Ga. App. at 565-566 (1) (b) (undisputed evidence showed emergency medical care was provided where patient was triaged as emergency patient, blood work showed acute renal failure, and requests for consultations were marked as critical status). Accordingly, the trial court erred by concluding otherwise as a matter of law.

2. Wilson next argues that the trial court erred by finding there was no factual question as to causation because she presented evidence that Dorothy's condition was treatable and that the family would have opted for more aggressive care if they had known the correct diagnosis. We agree that a jury question remains on this issue.

In general, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Punctuation and footnote

omitted.) *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014). We cannot say that this is such a plain and indisputable case.

Dr. Inthachak argues that Wilson cannot raise a factual question on causation because Steigner testified he would have made the same recommendation even if Dr. Inthachak had diagnosed Dorothy with a subdural hematoma. But Wilson presented expert testimony that a subdural hematoma was a treatable diagnosis, and there was testimony from Dorothy's family that they would have opted for more care, including a transfer to another hospital, had they known the correct diagnosis. Construing the evidence in Wilson's favor, as we must, this testimony is sufficient to raise a jury question on causation. See, e. g., *Adams v. Piedmont Henry Hosp.*, 365 Ga. App. 257, 268 (1) (878 SE2d 113) (2022) (jury question on causation where there was testimony that nurse's failure to report symptoms to doctor breached the standard of care and resulted in doctor's failure to provide treatment that could have prevented patient's death); *Orr v. SSC Atlanta Operating Co.*, 360 Ga. App. 702, 709 (2) (860 SE2d 217) (2021) (trial court erred in granting summary judgment on causation based on its finding that doctor would not have made different treatment decision if he had additional information because it was not court's role to weigh the evidence); *Mekoya*

*v. Clancy*, 360 Ga. App. 452, 463-464 (2) (861 SE2d 409) (2021) (question of causation for the jury where there was expert testimony that patient's condition could have been prevented if doctor had made proper diagnosis); *Evans v. The Medical Center of Central Ga.*, 359 Ga. App. 797, 800-802 (860 SE2d 100) (2021) (nurse's conduct, which breached standard of care, contributed to decision to discharge patient prematurely, which caused his death); compare *Reeves v. Mahathre*, 328 Ga. App. 546, 549-551 (759 SE2d 926) (2014) (physical precedent only) (finding no jury question on causation where doctor testified he would have made same treatment decision if he had known correct diagnosis and there was no expert testimony to establish causation). Accordingly, the trial court erred by granting summary judgment on this basis.

In sum, the trial court properly concluded that Dr. Inthachak provided care in the hospital emergency department, but factual questions remain as to whether he provided "emergency medical care" and as to causation.

For these reasons, we vacate the trial court's order, and remand the case for further proceedings consistent with this opinion.

*Judgment vacated, and case remanded. Miller, P. J., Doyle P. J., Brown, Gobeil, Hodges, Pipkin, Land, Watkins, Padgett ,JJ., concur. Mercier, C. J., Barnes, P. J., Dillard, P. J. McFadden, P. J.,and Rickman, J., concur in Division 2 and dissent in Division 1.*

A24A0398. WILSON et al. v. INTHACHAK et al.

McFADDEN, Presiding Judge, concurring in part and dissenting in part.

A doctor provides care. A patient receives care. The emergency medical care statute uses the term "provision," a form of "to provide." OCGA § 51-1-29.5 (c). So the statute's applicability turns on the location where the care was provided, not where it was received. The function of the statute confirms that interpretation. The General Assembly determined that health care providers alleged to have committed malpractice "in a hospital emergency department" should have the benefits of a lower standard of care and a higher burden of proof than other providers. OCGA § 51-1-29.5 (c). Dr. Nirandr Inthachak examined the CT scans in the relative quiet of his office and caused the results to be transmitted by facsimile.

For those reasons, I respectfully dissent from Division 1 (a). See *Kidney v. Eastside Med. Center*, 343 Ga. App. 401, 408-410 (4) (b) (806 SE2d 849) (2017) (physical precedent only). So I do not reach the issue of whether Dorothy Warren was in need of emergency medical care addressed in Division 1 (b). I concur in Division 2, which holds the evidence of causation sufficient to create a jury issue. The order granting summary judgment should be reversed.

I am authorized to state that Presiding Judge Barnes joins in this writing.

A23A0398. WILSON et al. v. INTHACHAK et al.

DILLARD, Presiding Judge, concurring in part and dissenting in part.

While I concur with Division 2 of the majority's opinion, I dissent from Division 1 because the plain and unambiguous language of OCGA § 51-1-29.5 (c)—the *emergency* medical care statute—provides that, for it to apply, a healthcare professional must provide *emergency* medical care to a patient in a specified *physical* location—*e.g.*, a hospital emergency department.[1] To be sure, as this case shows, technological advancements allow for medical care to be provided by a physician in any location to a patient in any location. But if emergency medical care is not provided

_____

[1] While OCGA § 51-1-29.5 (c) applies to all healthcare professionals providing emergency medical care in hospital emergency departments, obstetrical units, and surgical suites immediately following treatment in a hospital emergency department, for the sake of simplicity (and given the relevant context), I refer only to a hospital emergency department as the location in which medical care must be provided.

by a physician in a hospital emergency department, the emergency medical care statute is, by its plain terms, inapplicable. This is such a case.

In reaching a contrary interpretation, the majority applies various cannons of statutory construction and considers the statutory history of OCGA § 51-1-29.5 (c); but when the language of a statute is "plain and unambiguous, judicial construction is not only unnecessary but forbidden."[2] And unfortunately, the majority strays far into forbidden interpretive territory—so, like Presiding Judge McFadden, I concur in part and dissent in part.

1. In interpreting any statute, I necessarily begin with "familiar and binding canons of construction."[3] And in considering the meaning of a statute, this Court is charged with presuming the General Assembly "meant what it said and said what it meant."[4] As a result, we must afford the statutory text its "plain and ordinary

---

[2] *Hough v. State*, 279 Ga. 711, 716 (2) (a) (620 SE2d 380) (2005) (punctuation omitted); *accord Abdulkadir v. State*, 279 Ga. 122, 123 (2) (a) (610 SE2d 50) (2005); *see also* Anontin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

[3] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014).

[4] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted); *accord Arby's Res. Gp., Inc. v. McRae*, 292 Ga. 243, 245 (1), 734 SE2d 55 (2012); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

meaning,"[5] consider the text contextually,[6] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[7] and seek to "avoid a construction that makes some language mere surplusage."[8] So, when the

---

[5] *Deal*, 294 Ga. at 172 (1) (a) (punctuation omitted); *see State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies)[.]"); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning[.]" (citation and punctuation omitted)).

[6] *See Ariz. v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (citation and punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *In the Interest of L. T.*, 325 Ga. App. 590, 592 (754 SE2d 380) (2014) (same); *Martinez*, 325 Ga. App. at 273 (2) (same); *see also* OCGA § 1-3-1 (b) ("In all interpretations of statutes, the ordinary signification shall be applied to all words . . . ."); *Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (II) (C) (2) (7th Cir. 2013) (Manion, J.) ("In statutory construction cases, we begin with the language of the statute itself and the specific context in which that language is used." (citation and punctuation omitted)).

[7] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013); *Martinez*, 325 Ga. App. at 273 (2).

[8] *In the Interest of L. T.*, 325 Ga. App. at 592 (citation and punctuation omitted); *accord Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011); *Singletary*, 310 Ga. App. at 572.

3

language of a statute is plain and susceptible of only one natural and reasonable construction, "courts must construe the statute accordingly."[9]

Turning to the statute at hand, OCGA § 51-1-29.5 (c) provides:

> In an action involving a health care liability claim arising out of the *provision* of emergency medical care[10] *in a hospital emergency department* or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.[11]

---

[9] *Luangkhot*, 292 Ga. at 424 (1) (punctuation omitted); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)); *Martinez*, 325 Ga. App. at 273 (2) (same).

[10] *See* OCGA § 51-1-29.5 (a) (5) (defining "Emergency medical care" as meaning "*bona fide emergency services* provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of *immediate* medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part [and specifying that] *[t]he term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency*") (emphasis supplied)).

[11] (Emphasis supplied).

4

And here, the pertinent phrase is "[i]n an action involving a health care liability claim arising out of the provision of emergency medical care *in* a hospital emergency department . . . ."[12] Suffice it to say, reading this phrase "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[13] the healthcare professional *providing emergency* medical care must be *physically present* in a hospital emergency department when doing so.[14]

---

[12] (Emphasis supplied).

[13] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Martinez*, 325 Ga. App. at 273 (2).

[14] *See In*, THE OXFORD ENGLISH DICTIONARY (online edition May 2024), *available at* https://www.oed.com/search/dictionary/?scope=Entries&q=in (defining "in" as, *inter alia*, "anything which is in a given space is not out of it, and vice versa . . . emphasizing the relation to limits"); *id.* ("Expressing the situation of something that is or appears to be enclosed by something else: within the limits or bounds of, within (any place or thing)."); *see also OB-GYN Assocs., P. A. v. Brown*, 357 Ga. App. 655, 658-59 (1) (849 SE2d 257) (2020) (Colvin, J.) ("Applying the plain and ordinary meaning of the statute and rules of grammar, as we must, we note that OCGA § 51-1-29.5 (c) constitutes a list of three *locations* followed by a limiting clause . . . where a provider of emergency medical care would be subject to the gross negligence standard. The list is twice set apart by the preposition 'in.' The first use of the preposition 'in' creates one category of two locations that are not modified by the limiting phrase–that is: the 'hospital emergency department' and the 'obstetrical unit'" . . . ."); *CliniComp Int'l, Inc. v. Cerner Corp.*, 2022 WL 16985003, at *10 (S.D. Cal. Nov. 15, 2022) (noting that "[t]he plain and ordinary meaning of the word 'in' in this context is to indicate 'location or position within something.'") (citations omitted)).

Nevertheless, the majority is "persuaded that the statute intended to require *only* the patient's presence in the hospital . . . ."[15] I disagree.

As aptly noted by Presiding Judge McFadden in his dissent to Division 1 of the majority opinion, the statute plainly states that it is the *provision* of emergency medical care by the healthcare provider that must occur *in* a hospital emergency department, not merely the *receipt* of such care by the patient.[16] Importantly, the emergency

[15] (Emphasis supplied).

[16] The majority and the parties acknowledge our decision in *Kidney v. Eastside Med. Ctr., LLC*, 343 Ga. App. 401 (806 SE2d 849) (2017) (McFadden, J.) (physical precedent as to Division 4 only), *cert denied* on May 7, 2018, which is physical precedent in which we remanded a case involving the emergency medical care statute because it was unclear whether the radiologist was physically present in the hospital emergency room when he provided care. *See id.* at 408-09 (4) (b). In doing so, the putative majority opinion noted that if the radiologist "did not provide the medical care at issue in a hospital emergency department, he would not be entitled to the heightened evidentiary burden of the emergency medical care statute." *Id* at 409 (4) (b). And while physical-precedent opinions are not binding, we do often consider such opinions to be persuasive authority. *See Muldrow v. State*, 322 Ga. App. 190, 195 (744 SE2d 413) (2013) ("[S]ome of the judges on this Court are of the view that our physical-precedent cases should be afforded greater consideration than decisions from appellate courts in other jurisdictions. Nevertheless, it is crucial that litigants explicitly designate physical precedent as such, and thoroughly explain why this Court should adopt the reasoning from that particular opinion."); *Pechin v. Lowder*, 290 Ga. App. 203, 205 (659 SE2d 430) (2008) ("Although [a physical-precedent opinion] is not binding precedent on this Court, we nevertheless find its reasoning persuasive."). Given that the putative majority opinion in *Kidney* comports with the plain and unambiguous language of the emergency medical care statute, I find it persuasive and would adopt its reasoning in this case.

medical care statute delineates the circumstances in which the *physician* is subject to a gross negligence standard—*i.e.*, when he or she is *providing* medical care in the high pressured, fast-paced environment routinely present in an emergency-care setting.[17]

The majority disagrees, reasoning that if the General Assembly intended to require a physician to be physically present in the emergency room when providing emergency medical care, the statute would have explicitly stated that emergency medical care must be provided by "a physician physically located in the hospital emergency department." But that is what the statute already says, and the insertion

---

[17] *See Nguyen v. Sw. Emergency Physicians, P.C.*, 298 Ga. 75, 79 (2) (b) (779 SE2d 334) (2015) (Nahmias, J.) (noting that, in looking to the "location component" of the emergency medical care statute, "[i]t is clear that the ER statute applies only when the medical care at issue was provided 'in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department'. . . . But that is not the only requirement for the statute to apply. If it were, the statute would have been much shorter . . . . Instead, both subsections (c) and (d) specify that they apply in 'action[s] involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . .' And . . . the statute provides a definition of 'emergency medical care' that requires more than simply 'care provided in an emergency department.'" (citations omitted)); *Johnson v. Omondi*, 294 Ga. 74, 75 (751 SE2d 288) (2013) (noting that "there is no dispute that [the doctor] was acting as a physician, providing emergency medical care, *in* a hospital emergency department, *as contemplated by OCGA § 51–1–29.5 (c)*") (emphasis supplied)).

of "physically located" into the relevant text would be mere surplusage.[18] Indeed, when interpreting statutes, we are charged with reading the text "in its most natural and reasonable way, as an ordinary speaker of the English language would."[19] And an ordinary speaker of the English language would not add the words "physically located" when describing his or her physical location. Indeed, if someone asks you where you are, and you are in your home, a customary response would be: "I am at my house" or "I am in my house," not "I am physically located at [or in] my house." No one speaks like that. There was no need, then, for the General Assembly to add unnecessary, unnatural language to the emergency medical care statute to establish that a physician must be physically present in a hospital emergency department to be "in" that department and for the statute to apply.

And if the General Assembly intended to *limit* the physical presence in a hospital emergency department to *only* the doctor *or* patient, it could have easily done

---

[18] *See New Cingular Wireless PCS, LLC v. Ga. Dep't of Revenue*, 303 Ga. 468, 472 (2) (813 SE2d 388) (2018) (noting that courts should avoid construing a statute such that some language is mere surplusage); *Lyman v. Cellchem Int'l. Inc.*, 300 Ga. 475, 477 (796 SE2d 255) (2017) (same).

[19] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Luangkhot*, 292 Ga. at 424; *Martinez*, 325 Ga. App. at 273 (2).

so. The statute could have been drafted to provide, "[i]n an action involving a health care liability claim arising out of the *receipt* of emergency medical care in a hospital emergency department . . . ," or "[i]n an action involving a health care liability claim arising out of the provision of emergency medical care to a patient *who is in* a hospital emergency department . . . ." But the statute does not contain such an express limitation or differentiate between the required location of the patient and physician, so we must presume the decision not to do so was a matter of considered choice.[20] Needless to say, we are not at liberty to rewrite the statute to limit the physical-presence requirement to the patient only,[21] no matter how sensible doing so might

---

[20] *See, e.g.*, *Fair v. State*, 284 Ga. 165, 168 (2) (b) (664 SE2d 227) (2008) ("If the General Assembly had intended to require knowledge of the victim's status as a peace officer in order for the [statute] to apply, the statutory history shows that it knew how to do so. We must presume that its failure to do so was a matter of considered choice." (citation and punctuation omitted)); *Avila v. State*, 333 Ga. App. 66, 69-70 (775 SE2d 552) (2015) (noting that the General Assembly's use of the phrase "during the commission of the offense" in certain subsections of a criminal statute made clear that it knew how to specify that a disqualifying event must occur while the crime was in process, and that the subsection at issue did not include such a limitation); *Inland Paperboard & Packaging, Inc. v. Ga. Dep't. of Revenue*, 274 Ga. App. 101, 104 (616 SE2d 873) (2005) (noting that, if the General Assembly intended to include a particular exemption in a tax statute, the statutory history showed that it knew how to do so).

[21] *See Lumpkin Cnty. v. Georgia Insurers Insolvency Pool*, 292 Ga. 76, 78 (2) (734 SE2d 880) (2012) ("This Court . . . is not in the business of rewriting unambiguous statutory authority."); *Abdulkadir v. State*, 279 Ga. 122, 124 (2) (610 SE2d 50) (2005)

9

seem to some of my colleagues in light of certain technological advancements.[22] And

because I agree with Justice McMillian that this case is "one of gravity and great

---

("[A] court of law is not authorized to rewrite the statute by inserting additional language that would expand its application . . . ."); *Groover v. Johnson Controls World Serv.*, 241 Ga. App. 791, 793 (527 SE2d 639) (2000) (explaining that this Court can not "rewrite a statute under the guise of interpreting it"); *see also Nisbet*, 327 Ga. App. at 567 (1) (c) ( "In the absence of words of *limitation*, words in a statute should be given their ordinary and everyday meaning." (punctuation omitted)); *Six Flags Over Ga. v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003) (same).

[22] In construing the emergency medical care statute, the majority finds it relevant that Georgia law allows for "telemedicine services," which does not require either the physician or patient to be *physically* present in a *specific* location. But even if statutory construction were permitted in this case (which it is not), our Supreme Court has acknowledged that, under our general rules of statutory construction, there is a "preference to specific provisions over general ones." *Everetteze v. Clark*, 286 Ga. 11, 14 (4) (685 SE2d 72) (2009); *see Montgomery Cnty. v. Hamilton*, 337 Ga. App. 500, 507 (1) (788 SE2d 89) (2016) ("When there is in the same statute a specific provision, and also a general one which in its most comprehensive sense would include matters embraced in the former, the particular provision must control, and the general provision must be taken to affect only such cases within its general language as are not within the provisions of the particular provision. (punctuation omitted)). Here, the emergency medical care statute—which requires doctors *and* patients to be present in a specified physical location—must prevail over statutes generally allowing for telemedicine, which do not require either party to be in any particular location when such care is provided.

importance,"[23] it is my hope our Supreme Court will grant Wilson's inevitable certiorari petition and resolve this issue once and for all.[24]

2. Because Dr. Inthachack has not satisfied the physical-presence/location requirement of OCGA § 51-1-29.5 (c), there is no need for this Court to address whether the medical services he provided constituted emergency medical care under the statute.

For all these reasons, I concur in Division 2 of the majority's opinion and dissent to Division 1 (a).

I am authorized to state that Chief Judge Mercier and Judge Rickman join in this writing.

---

[23] *See* Ga. Const. Art. VI, Sec. VI, Par. V ("The Supreme Court may review by certiorari cases in the Court of Appeals which are of gravity or great public importance.").

[24] *See Wilson v. Inthachak*, 317 Ga. 868, 875 (896 SE2d 593) (2023) (McMillian, J., concurring) ("The issue on which the Court of Appeals divided—whether OCGA § 51-1-29.5 (c) applies to a physician who provides services while not physically within the hospital emergency department—is one of gravity and great public importance. However, I fully expect that upon return of the case to the Court of Appeals, review by the judges now currently sitting on that court, and issuance of an opinion, the losing party will seek certiorari review, at which time this Court will have another opportunity to decide this very important issue.").